<u>**NOT FOR PUBLICATION**</u>

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

|  |  |
|---|---|
| **JETT ELAD**,<br><br>             Plaintiff,<br><br>        v.<br><br>**NATIONAL COLLEGIATE ATHLETIC ASSOCIATION**,<br><br>          Defendant. | Civil Action No. 25-1981 (ZNQ) (JTQ)<br><br><br>**OPINION** |

<u>**QURAISHI, District Judge**</u>

     **THIS MATTER** comes before the Court upon an Emergent Application for Order to Show Cause filed by Plaintiff Jett Elad ("Elad") that seeks a preliminary injunction. ("Motion", ECF No. 1-3.) Elad specifically seeks a preliminary injunction order that: 1) enjoins Defendant National Collegiate Athletic Association ("NCAA") from enforcing its Five-Year Rule as it applies to his time spent at a junior college; 2) orders the NCAA to immediately grant Rutgers University ("Rutgers") and/or Elad a waiver of any NCAA eligibility rule that would preclude Elad from engaging in intercollegiate competition in the 2025–26 season based on his time spent at a junior college; 3) orders the NCAA to declare Elad eligible to play for Rutgers during the 2025–26 season; and 4) enjoins the NCAA from enforcing its Rule of Restitution (NCAA Bylaw § 12.11.4.2) against Elad or Rutgers for complying with, and relying on, an injunction entered by this Court. (ECF No. 1-6.) In support of his Motion, Elad filed a Verified Complaint ("VC", ECF No. 1) and Memorandum of Law ("Moving Br.", ECF No. 1-3). NCAA filed a brief in response

1



("Resp. Br.", ECF No. 7).  Elad filed a brief in reply ("Reply", ECF No. 10).  The NCAA filed a sur-reply.  (ECF No. 15.)  The Court conducted a hearing on April 16, 2025.  Having considered the parties' submissions, and the evidence and argument presented at the hearing, the Court will **GRANT** Elad's request for a preliminary injunction for the reasons set forth below.

## I.     <u>APRIL 16, 2025 HEARING CONDUCT AND TESTIMONY</u>

The Court conducted a hearing on April 16, 2025 over several hours during which Plaintiff presented three witnesses and Defendant presented one.  ("Tr.", ECF No. 28.)  All witnesses testified in person.  Prior to the hearing and for the purposes of time management, the parties stipulated that the reports of their experts, Dr. Maxcy and Dr. Flyer, would serve as their direct testimony and that their live testimony would be confined to cross examination.  The parties also entered twenty-seven joint exhibits.  (Ex. J-1 through J-8 and J-10 through J-28.)[1]

### A.     **JETT ELAD (HEARING TRANSCRIPT 33–64)**

Elad testified on his own behalf at the hearing.  He described his family history, his college football career, his hope to play for Rutgers this season, and the effects of the NCAA's denial of that opportunity.  Based upon Elad's demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found his testimony to be credible and assigns it substantial weight.

### B.     **GREG SCHIANO (HEARING TRANSCRIPT 65–84)**

Greg Schiano is head coach of the Rutgers University football team, a position he has occupied since 2020 and held previously from 2001 to 2011.  He has had a lengthy career, having coached in the National Football League and NCAA Division I since the early 1990s.  At the

---

[1] Exhibit J-9 was not admitted.  It was a declaration from a second expert witness for the NCAA, Dr. Matthew Backus, issued on March 27, 2025.  The NCAA withdrew Dr. Backus's declaration rather than make him available for cross-examination at the hearing.  (April 14, 2025 Letter, ECF No. 20.)

hearing, Schiano described various aspects of college football, including the NCAA's transfer portal, the Name Image Likeness ("NIL") deals now offered to college athletes, and his plans for Elad on the Rutgers team. Based upon Schiano's demeanor, manner in which he testified, and substance of his testimony in conjunction with other corroborative evidence, the Court found his factual testimony to be credible and assigns it substantial weight. Schiano also opined as to what he believes will be Elad's success in the NFL should Elad be permitted to play at Rutgers this season. Schiano was not formally presented as an expert in this regard, but based on his experience and qualifications, as well as the nature and demeanor of his testimony on that issue, the Court found Schiano's opinion testimony credible and also assigns it substantial weight.

### C.     JOEL MAXCY, PH.D. (HEARING TRANSCRIPT 85–121)

Dr. Maxcy is a professor at the LeBow College of Business at Drexel University. (Expert Report of Joel G. Maxcy, Ex. J-10 ¶ 1.) He is an economist with expertise in sports business, industrial organization, and labor economics. (*Id.*) He is the President of the International Association of Sports Economists. (*Id.*) He holds a Ph.D. in economics from Washington State University. (*Id.*) His areas of study include labor relations in sports, antitrust economics, industrial organizations, and sports finance. (*Id.* ¶ 2.) He served as the plaintiff's expert in *Pavia v. National Collegiate Athletic Ass'n*, Civ. No. 24-01336, 2024 WL 5159888 (M.D. Tenn. Dec. 18, 2024) ("*Pavia*") and co-authored and/or signed briefs *amici curiae* in other antitrust cases involving sports leagues, including *National Collegiate Athletic Ass'n v. Alston*, 594 U.S. 69 (2021) ("*Alston*") before the United States Supreme Court. Having reviewed Dr. Maxcy's education and experience, the Court finds that he is qualified to testify as an expert on antitrust issues involving collegiate athletics.

Dr. Maxcy's direct testimony (via his expert report) opines on the "JUCO Rule," under which the NCAA includes years played by college athletes at a junior college against the NCAA's

Five-Year Rule that limits college athletes to five years of college play. Dr. Maxcy defines the relevant market as "the labor market for college football athletes in general and NCAA Division I football specifically." (Ex. J-10 ¶ 13) (citing VC ¶ 44.) In his view, the NCAA exercises monopsony power in this market. (*Id.* ¶ 15) (citing *Alston*.) He opines that the NCAA's insistence on the JUCO Rule has substantial anticompetitive effects that include: reducing the level of competition in the market for early college athlete talent, depressing the cost to NCAA member schools to acquire players, and forcing college athletes to prematurely end their college careers, thereby again reducing competition in the market. (*Id.* ¶¶ 28–35.)

On cross-examination, the NCAA critiqued Dr. Maxcy's opinion as lacking various forms of qualitative and quantitative analyses. (Tr. at 94:16–97:9.) It also challenged the objectivity of his opinion, given his history of advocating for student athletes and his various publications criticizing the NCAA's business practices. (Tr. at 98:1–100:20.)

On the whole, assessing Dr. Maxcy's expert report as well as his demeanor, manner in which he testified, and the substance of his testimony together with other corroborative evidence, the Court found his testimony credible and assigns it substantial weight.

### D.     FREDERICK FLYER, PH.D. (HEARING TRANSCRIPT 122–151)

Dr. Flyer is an executive vice president at Compass Lexecon, an economics consulting firm, where he has worked for over twenty-five years. (Rebuttal Report of Dr. Frederick A. Flyer, J-11 ¶ 1.) He holds a Ph.D. in economics from the University of Chicago and a M.S. in labor and industrial relations from the University of Illinois. He has taught economics at New York University's Stern School of Business, Northwestern University, the University of Chicago and the University of California Los Angeles. (*Id.*) In the past twenty years, he has been engaged as an expert for over thirty lawsuits involving allegations of anticompetitive conduct. (*Id.* ¶ 3; J-11,

Exhibit A.)  Having reviewed Dr. Flyer's education and experience, the Court finds that he is qualified to testify as an expert on general antitrust matters.

Dr. Flyer's direct testimony (via his expert report) is offered in rebuttal to Dr. Maxcy's testimony.  Dr. Flyer opines that Dr. Maxcy fails to establish that the JUCO and Division I football programs participate in the same labor market.  (J-11 ¶¶ 5, 10–17.)  He also opines that Dr. Maxcy offers no reliable evidence in support of anticompetitive harms.  (*Id*. ¶¶ 6, 18–22)  Finally, Dr. Flyer opines on the pro-competitive effects of the NCAA's rules, which he says Dr. Maxcy ignores. (*Id*. ¶¶ 23–25).

On cross-examination, Dr. Flyer testified that he did not object to defining the relevant market in this case as "the labor market for college football athletes in general and NCAA Division I football players in particular."  (Tr. at 129:12–130:21.)  Dr. Flyer conceded that the Supreme Court's decision in *Alston*, and the NIL deals that have emerged after it, have introduced a commercial aspect to collegiate athletics.  (Tr. at 123:8–125:17.)  Moreover, rules restricting eligibility to play and thus negotiate those NIL deals are commercial insofar as they affected "money changing hands."  (Tr. at 128:4–129:7.)

On the whole, assessing Dr. Flyer's expert report as well as his demeanor, manner in which he testified, and the substance of his testimony together with other corroborative evidence, the Court found his testimony somewhat credible and assigns it only moderate weight for the following reasons: 1) although Dr. Flyer's qualifications are impressive, he appears to have no specific expertise with respect to the specific antitrust issues that arise in the context of collegiate athletics; 2) Dr. Flyer agreed to Plaintiff's relevant market; 3) Dr. Flyer acknowledged that the NCAA's eligibility rules had a commercial effect; and 4) Dr. Flyer's critique of Plaintiff's case as to antitrust injury appears to be that it is simultaneously too specific (i.e., limited to harms to Elad

rather than the market) and too broad (i.e., too speculative as to the effects on the market). Regarding the latter, Dr. Flyer in substance offers a competing narrative to Dr. Maxcy's rather than rebutting Dr. Maxcy's opinion.

## II.   FACTUAL BACKGROUND

### A.   THE NCAA

The NCAA is a voluntary, self-governing association of approximately 1,100 four-year member schools throughout the United States that administers athletic competition for student-athletes.  (Vaughn Decl. ¶¶ 4–5, ECF No. 7-1); *see Alston*, 594 U.S. at 79; *Pavia*, 2024 WL 5159888, at *2.  The NCAA's stated goal is to "provide student-athletes safe, fair, and inclusive athletic competition and exceptional academic experiences that foster lifelong well-being." (Vaughn Decl. ¶¶ 4, 10.)  The NCAA has three divisions: Division I, Division II, and Division III, each of which promulgates its own rules and operating guidelines.  (*Id.* at ¶ 5.)  Division I is comprised of 350 schools, with 180,000 student athletes.  (*Id.* at ¶ 7.)  Generally, Division I teams are the most popular and they attract the most money and the most talented athletes.  *See Alston*, 594 U.S. at 79.  Within Division I, the most popular sports are basketball and football.  *Id.*  Rutgers is an NCAA member and assigned to Division I.  (VC ¶ 37.)  The Supreme Court has characterized the NCAA as a "sprawling enterprise" that generates billions of dollars in revenue each year.  *See Alston*, 594 U.S. at 79, 93 (observing that annual television rights for the March Madness basketball tournament brought in close to $1.1 billion in 2016, and the television deal for the Football Bowl Subdivision College Football Playoff was worth approximately $470 million in 2012).

### B.   THE JUCO RULE

Generally, the NCAA Bylaws require that a student-athlete meet certain eligibility standards.  In relevant part, the NCAA Bylaws restrict the duration of a student-athlete's eligibility

to compete to four seasons within a five-year period.  At issue here is the NCAA's "counting" of time spent at junior colleges, which are non-NCAA institutions, toward the total eligibility time.  This Court will refer to this counting as the "JUCO Rule."  The Court reviews the provisions of the NCAA Bylaws that lead to this situation below.

NCAA Bylaw 12.8 includes a provision that is often referred to as the "Five-Year Rule," which provides in relevant part, as follows:

> **12.8 Seasons of Competition: Five-Year Rule.**  A student-athlete shall not engage in more than four seasons of *intercollegiate competition* in any one sport (see Bylaws 12.02.6 and 14.3.3).  An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:
>
> > **12.8.1 Five-Year Rule.**  A student-athlete shall complete the student-athlete's seasons of participation within five calendar years from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution, with time spent in the armed services, on official religious missions or with recognized foreign aid services of the U.S. government being excepted.  For international students, service in the armed forces or on an official religious mission of the student's home country is considered equivalent to such service in the United States.
> >
> > > **12.8.1.1 Determining the Start of the Five-Year Period.**  For purposes of starting the count of time under the five-year rule, a student-athlete shall be considered registered at a collegiate institution (domestic or foreign; see Bylaw 14.02.4) when the student-athlete initially registers in a regular term (semester or quarter) of an academic year for a minimum full-time program of studies, as determined by the institution, and attends the student's first day of classes for that term (see Bylaw 12.8.2).

(*See* Ex. J-1.)

Finally, according to NCAA Bylaw § 12.02.6, junior colleges (although excluded from Division I) are included in the definition of "intercollegiate competition" because that definition

includes "either a two-year or a four-year collegiate institution."[2]  (*Id.*)  Accordingly, the combination of these NCAA Bylaws counts the time played at a junior college against a student's limit for play.

### C.    NIL COMPENSATION

Until 2021, the NCAA limited compensation of student athletes in an attempt to maintain amateurism across college sports.  That year, in response to the Supreme Court's decision in *Alston*, the NCAA dramatically altered course and began to allow student-athletes to earn compensation for their name, image, and likeness ("NIL").  *See, e.g., Rashada v. Hathcock*, Civ. No. 24-219, 2025 WL 1043208, at *1 (N.D. Fla. Apr. 8, 2025); *Tennessee v. Nat'l Collegiate Athletic Ass'n*, 718 F. Supp. 3d 756, 759 (E.D. Tenn. 2024); *Pavia*, 2024 WL 5159888, at *1; *Ohio v. Nat'l Collegiate Athletic Ass'n*, 706 F. Supp. 3d 583 (N.D.W. Va. 2023).

### D.    ELAD'S HISTORY

Elad is a Canadian citizen who was born in Minnesota but grew up in Toronto, Ontario. (Tr. at 33:18-19; VC ¶ 6.)  Elad attended and played football for St. Ignatius High School in Cleveland, where his mother was working at the time.  (Tr. at 34:9-11.)  While at St. Ignatius, Elad was recruited by several Division I football programs, including Ohio University and other schools in the Mid-American Conference, also known as the "MAC."  (Tr. at 34:14-15, 54:8-17.)  Elad chose to attend and play football at Ohio University because it was close to his home, it was one of the better programs to make an offer to him, and he knew other students from his high school who were attending the university.  (Tr. at 34:14-20.)

---

[2] Notably, this definition for "intercollegiate competition" excludes post-secondary educational institutions like prep schools.  Dr. Flyer could not dispute on cross examination that "a player who's not ready academically or athletically, or both, to play high level Division I football can go and spend as many years as he wants at a Hotchkiss or a Choate and that doesn't count against him at all under the NCAA rules."  (Tr. at 144:1–6.)

### 1.    The 2019 Season

Elad redshirted during his first year at Ohio University.  (Tr. at 34:21-35:1; Ex. J-6 at 1.)
Because of his redshirt status, his first year at Ohio University counted towards the Five-Year Rule
but not the Intercollegiate Competition Rule.  (*See* Ex. J-1, Bylaws, §§ 12.8.1, 12.8.3.1.6.)  Later,
Elad came to appreciate that he was not ready for college or Division I football that first year.
(Tr. at 35:2-7.)  As he testified at the April 16 hearing: "I was young.  I was—I made mistakes.  I
just wanted to have fun.  I didn't really know how to work.  I didn't know what it meant to be a—
an athlete, really, especially one who—with the dreams of where I wanted to be."  (*Id.* at 35:9-12.)

### 2.    The 2020 Season

Like many athletes around the country, Elad's competition at Ohio University was limited
due to the COVID-19 pandemic.  (Ex. J-6 at 1; Ex. J-8, VC, ¶ 29.)  Due to the blanket waiver
granted by the NCAA for the pandemic, that season did not count towards either the Intercollegiate
Competition Rule or the Five-Year Rule for student-athletes, including Elad.  (Ex. J-5 at 1; Ex. J-
8, VC, ¶¶ 20, 29.)

### 3.    The 2021 Season

Elad played in nine games for Ohio University during the 2021 season.  (Ex. J-13 at 3.)  He
described that season as "one of [his] worst years" for various reasons including a turf toe injury
and retirement of the university's head coach and defensive backs coach.  (Tr. at 35:13–118, 24–
36, 36:2–3.)  Elad dropped all of his classes at Ohio University and entered the NCAA transfer
portal, seeking to transfer to another school.  (Tr. at 36:13–15.)  He received no offers on the portal
and his attempts to secure a walk-on spot at another Division I school failed.  (Tr. at 37:5–14.)

### 4.    The 2022 Season

With no Division I prospects, Elad transferred to Garden City Community College, a junior
college in Kansas where he played football during the 2022 season.  (Tr. at 38:17-20.)  The football

program and facilities there did not compare to those available at an NCAA member school or even a competitive high school, but Garden City did give him an opportunity to re-dedicate himself academically and athletically.  He agreed at the hearing that "toughing it out at JUCO was a good thing for [him] in the long run."  (Tr. at 39:10–12.)

       5.    The 2023 Season

Elad received more than seven offers from Division I programs to play for them in his 2023 season.  (Tr. at 39:15–19.)  He selected University of Nevada, Las Vegas ("UNLV").  There, he played in thirteen games, and started in seven of them as a safety, posting impressive record.  (J-13 at 2–3; Tr. at 40:5–9.)  At the end of his first year at UNLV, Elad was a John Cornish finalist, which is an award for the best Canadian collegiate football athlete.  (Tr. at 40:16–18.)

       6.    The 2024 Season

Elad played for UNLV for another year in the 2024 season.  He played in all fourteen games, started as safety in nine, and posted an excellent record.  (Ex. J-13 at 2; Tr. at 40:10–13.)  He was a finalist for the John Cornish award and was Honorable Mention, All Mountain West.  (Tr. at 40:14–18.)  He played in the L.A. Bowl where UNLV won and he had "one of his best games." (Tr. at 40:1–2; Ex. J-13 at 2.)

       7.    The 2025 Season

The ruling from the court in *Pavia* gave the UNLV coaches and Elad hope that he could play for another season.  (Tr. at 41:7–42:6.)  The NCAA issued what it called a "blanket waiver" in light of *Pavia* on December 23, 2024.  (Ex. J-2.)  Elad therefore entered the transfer portal and received a lot of interest.  (Tr. at 43:4–9.)  Greg Schiano, on behalf of Rutgers, recruited Elad.  Rutgers signed Elad as a transfer student-athlete on December 29, 2024.  (J-5 at 3.)  Elad's decision was based in part on a NIL deal for $550,000 compensation with an additional $100,000 incentive bonus if he is named to the All-Big Ten First Team.  (Tr. at 45:7–23.)

8.    <u>The Unsuccessful Request for Guidance, then a Waiver from the NCAA</u>

At the time Elad signed with Rutgers, both sides (and his former coaches at UNLV) believed he was eligible to play in the 2025 season.  (Tr. at 80:17–23; J-5 at 3.)  When Rutgers learned there was an issue, it filed a request on January 10, 2025 with the NCAA for an official interpretation as to Elad's eligibility.  (J-5 at 2.)  Still waiting for the NCAA's interpretation, Rutgers filed for a waiver on Elad's behalf in February 2025.  (J-4 at 5.)  On February 28, 2025, the NCAA denied Rutgers' waiver request.  (Tr. at 49:11–20; VC ¶ 40.)

## III.    **PROCEDURAL HISTORY**

Elad initiated this suit on March 20, 2025 with a Verified Complaint (ECF No. 1) and an Emergent Application for Order to Show Cause (ECF No. 1-2).  The Court entered the Order to Show Cause the same day.  (ECF No. 3.)  The Order granted an interim status quo Temporary Restraining Order ("TRO") to Elad, and set a hearing for April 3, 2025 and deadlines for further briefing.  (*Id*.)  The Court conducted a telephonic case management conference on March 28, 2025.  At the request of the parties, the Court adjourned the hearing to April 16, 2025 and extended the parties' briefing schedule.  (ECF No. 9.)  The parties consented to extend the TRO to accommodate the adjourned hearing.  (ECF No. 13.)  At the hearing, the parties again consented to extend the TRO to April 28, 2025 and submitted a proposed order, which the Court entered.  (ECF No. 25.)  At the Court's request, the parties each filed proposed findings of fact.  (ECF Nos. 26–27.)

## IV.    **JURISDICTION**

The Court has subject matter jurisdiction over the claims of the Verified Complaint under 28 U.S.C. §§ 1331, 1332, and 1367.

## V.    **LEGAL STANDARD**

"Preliminary injunctive relief is an extraordinary remedy and should be granted only in limited circumstances."  *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708 (3d Cir. 2004)

(internal quotation marks and citation omitted). This remedy should be granted only if movants establish that: (1) "they are likely to succeed on the merits of their claims"; (2) "they are likely to suffer irreparable harm without relief"; (3) "the balance of harms favors them"; and (4) "relief is in the public interest." *Issa v. Sch. Dist. of Lancaster*, 847 F.3d 121, 131 (3d Cir. 2017) (citation omitted). "A plaintiff's failure to establish any element in its favor renders a preliminary injunction inappropriate." *NutraSweet Co. v. Vit-Mars Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999) (citation omitted). With respect to the first factor, "on an application for injunctive relief, the movant need only make a showing of reasonable probability, not the certainty, of success on the merits." *Atl. City Coin & Slot Serv. Co., Inc. v. IGT*, 14 F. Supp. 2d 644, 657 (D.N.J. 1998) (internal quotation marks and citations omitted). In the end, however, "[t]he burden is on the moving party 'to convince the district court that all four factors favor preliminary relief.'" *Peter v. Att'y Gen. of N.J.*, Civ. No. 23-3337, 2023 WL 4627866, at *1 (D.N.J. July 19, 2023) (quoting *AT&T v. Winback and Conserve Program, Inc.*, 42 F.3d 1421, 1427 (3d Cir. 1994)).

## VI.   DISCUSSION

### A.   LIKELIHOOD OF SUCCESS ON THE MERITS

Here, Elad alleges that the NCAA's Intercollegiate Competition Rule violates Section 1 of the Sherman Antitrust Act of 1890 ("the Sherman Act"), which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

As a first matter, the NCAA contends that under *Smith v. National Collegiate Athletic Ass'n*, 139 F.3d 180, 185–186 (3d Cir. 1998), its eligibility rules are not commercial and therefore not subject to scrutiny under the Sherman Act. (Resp. Br. at 7–10.) To be sure, in the ordinary course this Court would yield to the authority of its Court of Appeals. But things have changed substantially in the twenty-five years that have elapsed since *Smith*. Significantly, the Supreme

Court's decision in *Alston* in 2021 opened the door for students to benefit from NIL deals. This has "drastically changed the landscape of collegiate athletics by allowing student-athletes to earn compensation for their name, image, and likeness ('NIL')." *Pavia*, 2024 WL 5159888, at *1 (citations omitted). Tellingly, the Supreme Court in *Alston* specifically urges caution in applying what may be outdated authority in this context: "[w]hether an antitrust violation exists necessarily depends on a careful analysis of market realities. If those market realities change, so may the legal analysis." *Alston*, 594 U.S. at 93 (citations omitted). Until much needed guidance is provided by the Third Circuit that clarifies the state of the law in the wake of *Alston*, this Court is left to intuit how our higher courts would rule when faced with the same facts before it.

Based on the preliminary record now before the Court—including the direct testimony of Dr. Maxcy and the cross-examination of Dr. Flyer discussed above—the undersigned finds that the JUCO Rule is commercial in nature because a NIL agreement is a commercial transaction and the JUCO Rule limits who is eligible to play and therefore to negotiate a NIL agreement. *See Pavia*, 2024 WL 5159888, at *6. Elad's NIL agreement is a real-life example of a wider phenomenon that Schiano acknowledged at the hearing: older, more experienced players generally receive more NIL compensation than younger, less experienced players at the same position. (Tr. at 68:19–22.) Selectively limiting JUCO students from that pool necessarily has a commercial effect. As Schiano observed, "no one's laughing now, and this is serious money that's being exchanged, big time." (Tr. at 29:20–21.) Accordingly, the Court finds that the JUCO Rule is subject to the Sherman Act.

This only begins the inquiry. To succeed under Section 1 of the Sherman Act, a plaintiff must show that a defendant "(1) participated in an agreement that (2) unreasonably restrain[s] trade in the relevant market." *Nat'l Hockey League Players' Ass'n v. Plymouth Whalers Hockey Club*,

325 F.3d 712, 718 (6th Cir. 2003).  The parties in this case do not dispute that the NCAA Bylaws are an agreement among the NCAA member schools.  At issue is whether the JUCO Rule unreasonably restrains trade.

The Supreme Court has "long recognized that in view of the common law and the law in this country when the Sherman Act was passed, the phrase 'restraint of trade' is best read to mean 'undue restraint.'"  *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018) (brackets and some internal quotation marks omitted).  Determining whether a restraint is undue for purposes of the Sherman Act "presumptively" calls for what the Supreme Court has described as a "rule of reason analysis." *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006); *Standard Oil Co. of N.J. v. United States*, 221 U.S. 1, 60–62 (1911).  That manner of analysis generally requires a court to "conduct a fact-specific assessment of market power and market structure" to assess a challenged restraint's "actual effect on competition."  *Am. Express*, 585 U.S. at 541 (internal quotation marks omitted).

The Supreme Court articulates the rule of reason analysis as a "three-step burden shifting framework" for "distinguish[ing] between restraints with anticompetitive effect that are harmful to the consumer and restraints stimulating competition that are in the consumer's best interest." *Id.*  "[T]he plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect."  *Id.*  Should the plaintiff carry that burden, the burden then "shifts to the defendant to show a procompetitive rationale for the restraint."  *Id.*  If the defendant can make that showing, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means."  *Id.* at 542.

A plaintiff can demonstrate a substantial anticompetitive effect directly or indirectly.  *Id.* Direct evidence of an anticompetitive effect is "'proof of actual detrimental effects [on competition],' such as reduced output, increased prices, or decreased quality in the relevant

market." *Id*. (citations omitted). Indirect evidence is "proof of market power plus some evidence that the challenged restraint harms competition." *Id*. (citations omitted).

Against this lengthy backdrop, Elad asserts a relatively straightforward argument: as the sole rule-making authority, the NCAA exercises power in the relevant market and it is anticompetitive for the NCAA to count students' play at a junior college against their NCAA year-limit. (VC ¶¶ 49, 53–54.) The anticompetitive effect of this policy is to "discourage and penalize student-athletes from attending Junior Colleges[,] harm the Junior Colleges' ability to compete with Division I schools for talented athletes and limit the choice of educational institutions available to student-athletes." (*Id*. ¶ 54.)

Specifically, the JUCO Rule limits the NCAA Division I eligibility of student-athletes who attended junior college to two or three seasons while student-athletes who attend only NCAA Division I institutions have four years of Division I eligibility. Division I play offers greater exposure, better coaching, increases the probability of a future professional career, and makes a NIL agreement more likely. Student athletes who choose junior colleges because it is a better fit for them academically or athletically, lose at least a year of eligibility to play at the NCAA level. All of this gives a recruiting advantage to NCAA Division I member schools over junior colleges despite the fact that they are treated the same in terms of eligibility. (Maxcy Report at ¶¶ 28–29.) Removing players with the JUCO Rule distorts the labor market by reducing competition, depressing the prices at which Division I schools can acquire athletes, and the pay athletes can earn in NIL agreements. (*Id*. ¶ 33); *Pavia*, 2024 WL 5159888, at *10.

The NCAA argues that the gravamen of Elad's arguments as to anticompetitive harm are personal to himself rather than to the market as a whole. It maintains that the JUCO Rule is neutral insofar as it merely shifts the opportunities in the market from one set of student-athletes to

another, what its counsel at the hearing described as "a zero sum game." (Tr. at 162:4–17.) But as the *Pavia* court aptly recognized, this "ignores the new economic realities in the age of NIL compensation." 2024 WL 5159888, at *10. "[R]estrictions on who can compete (and earn NIL compensation) and for how long necessarily have anticompetitive effects." *Id.*

For these reasons, the Court finds that Elad has shown a likelihood that the JUCO Rule has a substantial effect on the labor market for college football. The burden shifts to the NCAA to show a procompetitive justification for the JUCO Rule.

In response, the NCAA posits procompetitive justifications: "provid[ing] a differentiated product from professional offerings such as the NFL"; and preserving the student-athlete experience for freshman students who might be unable to compete for positions with older, more experienced athletes coming from junior colleges.[3]  (Resp. Br. at 22, 25; Flyer Report ¶¶ 23–24.)

The Court does not find these justifications compelling. As to the first, if the differentiated product for the NCAA is younger, less experienced athletes, this does not square with the NCAA's other exceptions to its Five-Year Rule that permit older students joining after prep schools, military service, and religious obligations. *See* Bylaw § 12.8.1. As to the second justification, the *Pavia* court has observed a practical inconsistency: "Division I programs use the transfer portal to fill positions for the next season. Those transfers—which are allowed by the NCAA—take a position that might otherwise go to an incoming freshman player." *Pavia*, 2024 WL 5159888, at *11. The Court therefore finds that the NCAA has not carried its burden of advancing a procompetitive rationale for its competitive restraints.

---

[3] NCAA's briefing advances a third pro-competitive justification: improving quality of output by "fostering better alignment between Division I athletics and academics." As evidence in support of this justification, however, the NCAA relies upon the Declaration of Matthew Backus, Ph.D. (Resp. Br. at 25–26.) Insofar as the NCAA elected to withdraw Dr. Backus's declaration rather than subject him to cross examination at the hearing, the Court does not consider Dr. Backus's declaration nor the argument that relies upon it.

Based on this preliminary record, the Court finds that Elad has demonstrated a likelihood of success on the merits of his Sherman Act claim (Count One).[4]

### B.   IRREPARABLE HARM

The second factor is irreparable harm. The NCAA argues that Elad's delay in seeking relief from the court militates against his showing of irreparable harm. (Resp. Br. at 30.) The Court, however, finds no undue delay. Elad sought relief from the NCAA through February 28, 2025 until his request was denied. Afterwards, Elad and Rutgers continued to negotiate with the NCAA, including pursuing an internal appeal. (VC ¶ 41.) Elad filed his Verified Complaint less than a month later. The Court therefore finds Elad timely sought his relief here.

Elad's harms are clear on this record. A loss of his NIL agreement if he is unable to play this season can be quantified, but his lost opportunity to play a year of Division I football for a Big Ten team is incalculable in terms of personal experience. This season at Rutgers is a chance for Elad to build memories and lasting relationships both on and off the field, and to help lead the Rutgers football program to success. Schiano testified that

> after coaching [Elad] for nine practices, we are thrilled that we made the right evaluation because he is everything I thought he was and more. And you don't really get to know him as a person, but now I've gotten to know him as person, he's [a] better person than I even could have wished. So those two things combined, I think he could be not only a real fine player on our defense, but he'll serve as a leader on our defense.

(Tr. at 71:16–23.) Even more enticing, Schiano credibly testified at the hearing that he believes that after this year of play, Elad is likely to realize his lifelong dream of playing in the NFL:

> I've put a lot of players into the National Football League in my 38 years of coaching. I have been a head coach in the National Football League. I've been an assistant coach in the National Football League. I've been through five drafts as an employee of a team. I

---

[4] Insofar as Elad has shown a likelihood of success on his Sherman Act claim, the Court does not reach the other two claims asserted in his Verified Complaint.

have had to make the selections in the draft.  And when you do something as long as I've done it, when you see a player, you know if he has the "it" or he doesn't, and Jett has it.

(Tr. at 72:4–11.)  Schiano further unequivocally stated when asked whether "Elad is an NFL-caliber safety" that "Yes, he is."  (Tr. at 72:22–24.)  On top of this, Schiano testified that "[w]ith the exception of injury, which you can never predict—that's God's will[,] [b]ut if [Elad] were to stay healthy, he'll be an NFL safety."  (Tr. at 74:13–15.)  The personal and financial value of making that dream real is beyond this Court's capacity to measure.

Finally, this injunction is potentially Elad's *only* opportunity to complete his Division I career and transition into the NFL.  The Court asked counsel for the NCAA at the hearing whether it would permit Elad to play in a later season if he was denied an injunction now but later won on the merits of his suit after the 2025 season.  Counsel could take no position.  (Tr. at 121:2–122:2.)  Schiano painted a dimmer picture of the future for Elad if he cannot play for Rutgers this season:

> It's going to very hard because of what [Elad] mentioned.  He did not go through any of the pro—all the NFL things that lead up to the draft.  He did not go through pro day.  He did not have the opportunity to be invited to the combine.  He did none of that, under the impression that he was going to be able to play another season of college football.

(Tr. at 73:2–7.)

For all of these reasons, the Court finds that Elad has demonstrated he would suffer irreparable harm absent a preliminary injunction.

### C.      BALANCE OF THE EQUITIES

For the third factor, the Court balances the equities as between the parties.  As set forth above, Elad is likely to suffer substantial, immediate, and irreparable harm should he be prevented from playing this season.  The NCAA, by contrast, would suffer little harm insofar as, should they

18

later succeed on the merits, they can terminate Elad's eligibility.  Accordingly, the Court finds that the balance of the equities weighs heavily in Elad's favor.

### D.    THE PUBLIC INTEREST

Finally, the Court must weigh whether the public interest favors injunctive relief pending the outcome of this litigation.  "As a practical matter, if a plaintiff demonstrates both likelihood of success on the merits and irreparable injury, it almost always will be the case that the public interest will favor the plaintiff."  *AT&T*, 42 F.3d at 1427 n.8.  The Court has already found a likelihood of success on the merits and irreparable injury.  Moreover, as this Court has previously observed, "free and fair competition in the labor markets is essential to the American economy."  *Williams v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 24-1098, 2024 WL 397760, at *3 (D.N.J. Feb. 2, 2024) (citation omitted).  The Court therefore concludes that an injunction in this instance would serve the public interest.

Based on the foregoing, the Court concludes that the Motion for a Preliminary Injunction should be **GRANTED**.

### E.    SECURITY

In their submissions, the parties did not address whether a security was appropriate in this instance.  At the hearing, counsel for the NCAA stated that it would not require a bond.  (Tr. at 164:15–19).  Based on the NCAA's representation, and the Court's review of the record before it, the Court finds that because it does not appear that the NCAA will suffer any financial burden in complying with this injunctive relief, no security is necessary.  Accordingly, the Court finds that no security will need to be posted prior to the issuance of the accompanying Order.

### F.    RESTITUTION RULE

Finally, Elad asks that the Court enjoin the NCAA's Rule of Restitution (Bylaw § 12.11.4.2) in addition to its JUCO Rule.  That Rule of Restitution would chill Elad's and Rutgers'

ability to rely on an injunction from this Court by leaving each of them subject to serious penalties if the injunction is later voluntarily vacated, stayed or reversed. The Court finds that the Restitution Rule must be enjoined for its injunction of the JUCO Rule to have meaningful effect. This Court will therefore also enjoin the NCAA's enforcement of the Restitution Rule as to Elad.

## VII.  **CONCLUSION**

The Court is mindful that in electing to follow the reasoning of the *Pavia* decision from the Middle District of Tennessee, it has necessarily chosen not to follow the reasoning of other well-intentioned district courts that have more recently found that the NCAA's eligibility rules are not commercial in nature. *See Osuna v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-62, 2025 WL 684271, at *3 (E.D. Tenn. Mar. 3, 2025) (denying preliminary injunction); *Goldstein v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-27, 2025 WL 662809 (M.D. Ga. Feb. 28, 2025) (denying TRO and preliminary injunction); *Arbolida v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-2079, 2025 WL 570830 (D. Kan. Feb. 21, 2025) (denying TRO and acknowledging that the plaintiff might succeed on a preliminary injunction, but dismissing case prior to a preliminary injunction hearing); *Ciulla-Hall v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-10271, 2025 WL 438707 (D. Mass Feb. 7, 2025 (denying TRO); *but see Fourqurean* v. *Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-68, 2025 WL 993975 (W.D. Wis. Feb. 6, 2025) (granting preliminary injunction).[5] Notably, the earlier two decisions in the NCAA's favor, *Arbolida* and *Ciulla-Hall*, are substantially less persuasive because they were made on a more limited TRO record.

Nevertheless, it is difficult to discern which district court will ultimately be proven correct. To be clear, this Court means to express no hubris in this regard. The divergence of opinions at

---

[5] The Court observes, without commenting on its significance, that *Osuna Sanchez*, *Arbolida*, *Ciulla-Hall*, and *Goldstein* (where the NCAA prevails) each involve baseball players, while *Pavia*, *Fourqurean*, and now *Elad*'s case (where the players prevail) each involve football players.

the district court level[6] is evidence of only one thing: the uncertain landscape we now find ourselves in post *Alston* where well-reasoned and intentioned district judges may disagree. It is readily apparent that guidance from the courts of appeals, and possibly the Supreme Court, is needed. This Court welcomes that guidance, and if ultimately deemed incorrect in its analysis, will have clearer precedent to follow moving forward. In the interim, until this matter is fully adjudicated, or this court receives the necessary guidance on the impact and limitations the Supreme Court intended, Elad plays.

The Court is not concerned at this juncture whether allowing Elad to play would open up opportunities for others with junior college experience to also extend their playing time. The respective courts and the NCAA will address any further requests and challenges at the proper time. Nonetheless, if that is the likely result, so be it. The NCAA has previously demonstrated an inherent ability to adapt to an ever-changing environment in college athletics. This Court has no doubt it can do so here. After all, the NCAA's stated goal is to "provide student-athletes safe, fair, and inclusive athletic competition and exceptional academic experiences that foster lifelong well-being." This Court trusts that the NCAA will continue its mission and that Elad will make the most of his opportunities this season.

---

[6] The Court was made aware of two recent state court decisions out of North Carolina involving athletes and their NCAA eligibility under the Five-Year Rule. *See Smith & Devones v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-3480 (N.C. Bus. Ct. Apr. 24, 2025); *Jones & Bergeron v. Nat'l Collegiate Athletic Ass'n*, Civ. No. 25-3492 (N.C. Bus. Ct. Apr. 24, 2025). In these cases, the plaintiffs sought must broader relief: striking down the entire Five-Year Rule. Significantly, these cases did not involve JUCO and were challenges based on North Carolina's antitrust laws, not the Sherman Act. The state judge posited in both cases that "[w]hile Plaintiffs might well eventually present adequate evidence to demonstrate that the NCAA's enforcement of Bylaws 12.8.1 and 12.11.4.2 is arbitrary and otherwise violates Chapter 75, based on the limited facts in evidence at this stage of the case and after careful balancing of the equities, the Court concludes that Plaintiffs have not yet shown a reasonable *likelihood* that they will do so or that they will be irreparably harmed if the NCAA is not restrained from enforcing those longstanding Bylaws." For reasons already articulated, based on this record, the Court finds that Elad has successfully proven success on the merits and irreparable harm unlike the plaintiffs in North Carolina.

For the reasons set forth above, the Court will **GRANT** Elad's Motion for a Preliminary Injunction.  The NCAA will be enjoined from enforcing the Five-Year Rule as it applies to Elad's time at a junior college.  The NCAA will be ordered to immediately grant Rutgers University and/or Elad a waiver of any NCAA eligibility rule that would preclude Elad from engaging in intercollegiate competition in the 2025–26 season based on his time spent at a junior college.  It will also be ordered to declare Elad eligible to play for Rutgers during the 2025–26 season.  No security will be required.  Finally, the NCAA will be enjoined from enforcing its Rule of Restitution (Bylaw § 12.11.4.2) against Elad or Rutgers for complying with, and relying on, the Order that will accompany this Opinion.  An accompanying Order will be issued.


Date: April 25, 2025

s/ Zahid N. Quraishi_____
**ZAHID N. QURAISHI**
**UNITED STATES DISTRICT JUDGE**
