UNITED STATES DISTRICT COURT
DISTRICT OF NEBRASKA

Jackson Hasz,

           Plaintiff,

   vs.

National Collegiate Athletic Association,

         Defendant.

Case No. 8:25-cv-398

**BRIEF OF DEFENDANT NCAA
IN OPPOSITION TO
PLAINTIFF'S MOTION FOR
PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

TABLE OF CONTENTS ............................................................................................ i

INTRODUCTION ................................................................................................... 1

RELEVANT FACTS ............................................................................................... 3

I.     THE NCAA'S ELIGIBILITY RULES ENSURE THAT ONLY BONA FIDE
       COLLEGE STUDENTS PARTICIPATE IN INTERCOLLEGIATE ATHLETICS .......... 3

       A.     The Five-Year Rule Implements a Policy that NCAA Athletes Also Be
              Students ............................................................................................. 3

       B.     Waivers to the Five-Year Rule Are Available To Students Who Have Lost
              Seasons of Competition or Eligibility, But Not in Order to Get Extra
              Seasons ............................................................................................... 5

       C.     Division I Has Enacted Two General Waivers that Are Relevant Here ................. 5

              1.     Division I Already Approved a Waiver for the COVID Year of
                     2020 that Applies to Hasz ........................................................... 5

              2.     In Response to the *Pavia* Lawsuit, Division I Approved a Limited
                     Waiver Related to the Five-Year Rule that Does Not Apply to
                     Hasz .......................................................................................... 6

II.    HASZ PLAYED FOUR FULL SEASONS OF COMPETITION IN DI
       FOOTBALL AND ALSO USED UP HIS FIVE-YEAR ELIGIBILITY CLOCK ............ 6

III.   HASZ WANTS TO EARN MONEY BY GETTING A FIFTH SEASON OF
       COMPETITION AND A SIXTH SEASON OF ELIGIBILITY ......................................... 7

ARGUMENT ........................................................................................................... 9

I.     HASZ'S MOTION IS SUBJECT TO A HEIGHTENED STANDARD OF
       PROOF BECAUSE IT WOULD ALTER THE STATUS QUO ....................................... 9

II.    HASZ FAILS TO MEET THE HEIGHTENED STANDARDS FOR
       PRELIMINARY INJUNCTIVE RELIEF ................................................................... 10

       A.     Hasz Cannot Show a Likelihood of Success on His Antitrust Claim ................... 11

              1.     The Five-Year Rule Is Not Subject to Antitrust Scrutiny ......................... 11

              2.     The Five-Year Rule Survives Rule of Reason Analysis ............................ 13

                     (a)     Hasz Does Not Offer Evidence of Anticompetitive Effects
                             in a Relevant Market ....................................................... 14

(i)  Hasz's Alleged U.S. Labor Market for Division I Football Players Is Unsupported, and He Fails to Show Anticompetitive Effects in Such a Market............. 16

(A)  Eligibility Rules Create Competition and Are Not "Anticompetitive"....................................17

(B)  Hasz Shows No Anticompetitive Effects in His Labor Market....................................19

(ii)  Hasz's Proposed Nationwide Consumer Market Is Similarly Unsupported, and He Also Fails to Show Anticompetitive Effects in Such a Market.......................22

(b)  Hasz Has Not Suffered Antitrust Injury........................................23

(c)  The Five-Year Rule Is Procompetitive Because It Creates the "Product" that NCAA Members Offer and Increases Competition among Member Schools for Players.......................24

(d)  There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule ....................................25

B.  Hasz Will Not Suffer Irreparable Harm If His Motion Is Denied ........................28

C.  The Balance of Equities and Public Interest Tip Strongly Against Hasz .............30

CONCLUSION...................................................................................31

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Agnew v. NCAA*
    683 F3d 328, 342–43 (7th Cir. 2012) .....................................................................24

*Arbolida v. NCAA,*
    No. 25-2079-JWB, 2025 WL 579830 (D. Kan. Feb. 21, 2025)...........................21, 25

*Banks v. NCAA,*
    977 F2d 1081 (7th Cir. 1992) .....................................................................13, 24, 25

*Bewley v. NCAA,*
    No. 23 CV 15570, 2024 WL 113971 (N.D. Ill. Jan. 10, 2024)...............................31

*Biediger v. Quinnipiac Univ.,*
    616 F. Supp. 2d 277 (D. Conn. 2009) .....................................................................30

*Bowers v NCAA,*
    974 F Supp 459 (D.N.J. 1997) .....................................................................13, 25

*Bricklayers, Masons, Marble & Tile Setters, Protective & Benevolent Union v.*
    *Lueder Constr. Co.,*
    346 F.Supp 558 (D. Neb. 1972) .....................................................................10, 31

*Brown Shoe v. United States,*
    370 U.S. 294 (1962).....................................................................15, 20

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.,*
    429 U.S. 477 (1977).....................................................................23

*Brzovic v. NCAA,*
    No. 2:25-cv-02885-DCN, 2025 WL 1370758 (D.S.C. May 11, 2025) ...............10, 12, 13

*Chisano v. Newton,*
    No. 4:23-CV-3133, 2024 WL 2092000 (D. Neb. May 9, 2024)...............................9

*Chlorine Inst., Inc. v. Soo Line R.R.,*
    792 F.3d 903 (8th Cir. 2015) .....................................................................29

*Ciulla-Hall v. NCAA,*
    No. 25-cv-10271-DJC, 2025 WL438707.....................................................................22

*Coley v. NCAA,*
    No. 5:25-CV-98-D, 2025 WL 1616719 (E.D.N.C. June 6, 2025)...............10, 11, 13, 14, 31

*Dataphase Sys. v. C L Sys.*,
    640 F.2d 109 (8th Cir. 1981) ........................................................................10, 11

*Doe v. Portland Pub. Sch.*,
    701 F. Supp. 3d 18 (D. Me. 2023) ........................................................................30

*Double D Spotting Serv. v. Supervalu, Inc.*,
    136 F.3d 554,560 (8th Cir. 1998) ........................................................................15

*Dziewa v. Pa. Interscholastic Ath. Ass'n*,
    No. 08-5792, 2009 WL 113419 (E.D. Pa. Jan. 16, 2009).......................................30

*Enquist v. Quaker Oats Co.*,
    327 F. Supp. 347 (D. Neb. 1971).........................................................................10

*Ferry-Morse Seed Co. v. Food Corn*, *Inc.*,
    729 F.2d 589 (8th Cir. 1984) ................................................................................9

*Fieler v. Chrysler Corp.*,
    No. C 93-3797, 1994 WL 478721 (N.D. Cal. Aug. 24, 1994)................................20

*Fofana v. Mayorkas*,
    4 F.4th 668 (8th Cir. 2021)...........................................................................16, 17

*Fourqurean v. NCAA*,
    No. 25-CV-68, 2025 WL 993975 (W.D. Wis. Feb. 6, 2025) ................................21

*Gaines v NCAA*,
    746 F Supp 738 (M.D. Tenn. 1990)..................................................................12, 13

*GMC v. Harry Brown's, LLC*,
    563 F.3d 312 (8th Cir. 2009) ..............................................................................11

*Goldstein v NCAA*,
    No. 325-CV-00027-TES, 2025 WL 662809 (M.D. Ga. Feb 28, 2025)...............12, 13, 15, 22

*H&R Block, Inc. v. Block, Inc.*,
    58 F.4th 939 (8th Cir. 2023) ..............................................................................11

*Hall v. NCAA*,
    985 F. Supp. 782 (N.D. Ill. 1997) .......................................................................29

*Janjua v. Neufeld*,
    933 F.3d 1061 (9th Cir. 2019) ............................................................................16

*Jet Midwest Int'l Co v. Jet Midwest Grp., LLC*,
    953 F.3d 1041 (8th Cir. 2020) ............................................................................29

*Johnson v. NCAA,*
   2025 WL 1790345 ................................................................10, 12, 13, 14, 17, 20, 23, 25, 28

*Jones v NCAA,*
   392 F. Supp. 295 (D. Mass. 1975) .........................................................................12

*Little Rock Cardiology Clinic PA v. Baptist Health,*
   591 F.3d 591 (8th Cir. 2009) .................................................................................15

*McCormack v NCAA,*
   845 F 2d 1338 (5th Cir.1988) ................................................................................25

*McGee v. Va. High Sch. League,*
   801 F. Supp. 2d 526 (W.D. Va. 2011) ...................................................................30

*Midwest Comm'ns, Inc. v. Minnesota Twins, Inc.,*
   779 F.2d 444 (8th Cir. 1985) .................................................................................19

*National Ass'n of Review Appraisers & Mortgage Underwriters v. Appraisal
   Found.,*
   64 F.3d 1130 (8th Cir. 1995) .................................................................................23

*Navarro v. Fla. Inst. Of Tech., Inc.,*
   2023 WL 2078264 (M.D. Fla. Feb. 17, 2023) ........................................................30

*NCAA v. Alston,*
   594 U.S. 69 (2021)...............................................12, 13, 14, 16, 17, 24, 25, 26, 28

*NCAA v. Board of Regents,*
   468 U.S. 85 (1984)....................................................................................13, 24, 26

*Niemann v. Carlsen,*
   No. 4:22-cv-01110-AGF, 2023 WL 4198227 (E.D. Mo. June 27, 2023)................18

*O'Bannon v. NCAA,*
   802 F.3d 1049 (9th Cir. 2015) ....................................................................11, 12, 13

*Ohio v. Am. Express,*
   585 U.S. 529 (2018)..........................................................................................13, 14

*Ohio v. NCAA,*
   706 F. Supp. 3d 593 (N.D. W. Va. 2023) ........................................................16, 17

*Osuna Sanchez v. NCAA,*
   No. 3:25-cv-62, 2025 WL 684271 (E.D. Tenn. Mar. 3, 2025).........................12, 13

*Padda v. Becerra,*
   37 F.4th 1376 (8th Cir. 2022) ................................................................................11

*Par v. Wolfe Clinic, P.C.*,
   70 F.4th 441 (8th Cir. 2023) ...........................................................20

*Pavia v. NCAA*,
   760 F. Supp. 3d 527 (M.D. Tenn. 2024)..................................6, 17

*In re Pork Antitrust Litig.*,
   No. 18-1776(JRT/JFD), 2025 WL 1224694 (D. Minn. Apr. 28, 2025)..........26

*Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*,
   614 F.3d 57 (3d Cir. 2010)...............................................................26

*Rathmann Grp. v. Tanenbaum*,
   889 F.2d 787 (8th Cir. 1989) ............................................................9

*Razorback Ready Mix Concrete Co., Inc. v. Weaver*,
   761 F.2d 484 (8th Cir. 1985) ..........................................................20

*Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.*,
   798 A.2d 830 (Commw. Ct. of Pa. May 21, 2002)........................30

*Roudachevski v. All-American Care Ctrs., Inc.*,
   648 F.3d 701 (8th Cir. 2011) ..........................................................28

*S.A. v. Sioux Falls School Dist. 49-5*,
   2023 WL 6794207 (D.S.D. Oct. 13, 2023)......................................30

*S.B. Brown v. Ballard Cty. Bd. of Educ.*,
   780 F. Supp. 2d 560 (W.D. Ky. 2011)..............................................30

*Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*,
   997 F.2d 484 (8th Cir. 1993) .......................................................9, 24

*Sharon City Sch. Dist. v. PIAA*,
   No. 9-213, 2009 WL 427373 (W.D. Pa. Feb. 20, 2009).................30

*Smith v. NCAA*,
   139 F. 3d 180 (3d Cir. 1998)......................................................11, 13

*Tampa Electric Co.v. Nashville Coal Co.*,
   365 U.S. 320 (1961).........................................................................15

*Twin Cities Safety, LLC v. Moe*,
   139 F.4th 1015 (8th Cir. June 16, 2025) .........................................27

*United States v. Archer-Daniels-Midland Co.*,
   866 F.2d 242 (8th Cir. 1988) ..........................................................15

*United States v. Grinnell*,
    384 U.S. 563 (1966) ......................................................................15

*Walker v. NCAA*,
    No. 3:25-cv-00514, ECF 20 (M.D. La. July 1, 2025) ...........................5, 29

*Western Parcel Express v. UPS of Am.*,
    65 F.Supp.2d 1052 (N.D. Cal. 1998) ...................................................15

*White v. NFL Players Ass'n*,
    756 F.3d 585 (8th Cir. 2014) ............................................................18

*Williams v. NCAA*
    No. 24-cv-614, 2024 WL 397760, at *9 (D.N.J. Feb. 2, 2024) ................30

*Zeigler v. NCAA*,
    No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952 (E.D. Tenn. June 26, 2025) ......................31

*Zeigler*, No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952, at *5 (E.D. Tenn. June
    26, 2025) ....................................................................................14

**Statutes and Rules**

15 U.S.C. § 1 ...................................................................................11

Sherman Antitrust Act .........................................................11, 12, 13, 20

Fed. R. Ci. P. 65 ...............................................................................10

## INTRODUCTION

Plaintiff Jackson Hasz asks the Court to enter a disfavored mandatory injunction that would alter the status quo, suspend an NCAA eligibility rule, and allow Hasz to play an extra season of Division I football starting in August 2025.  The rule at issue is the Five-Year Rule (Bylaw 12.8.1) – which limits a student-athlete to four seasons of competition within a five-year eligibility window that applies to any NCAA member or two-year institution.  The Five-Year Rule was enacted by the NCAA's members—all institutions of higher education—to ensure that college athletes are, in fact, college students making academic progress toward a degree.

It is undisputed that Hasz has already played four full seasons of Division I college football.  Hasz nevertheless argues that denying him another year of college football violates antitrust law because it deprives him of the opportunity to compete and earn money for use of his name, image, and likeness ("NIL").  According to Hasz, the concept of eligibility itself is unlawfully "anticompetitive" because it limits the number of competitors to those who are eligible—there would be more competition, argues Hasz, if both eligible *and* ineligible people could compete.

Hasz's legal theory lacks any limiting principle.  If accepted, it would not only establish precedent applicable to similarly situated plaintiffs, it would jeopardize *all* eligibility rules.  The NCAA's brand of intercollegiate athletics cannot exist without eligibility rules.  This is why the NCAA contests this case and the 25 similar cases filed across the country, the vast majority of which the NCAA has won.

This motion should be denied because Hasz fails to meet any of the heightened standards for an injunction that alters the status quo.  First, Hasz cannot prove a substantial likelihood of success on his antitrust claim because he offers no evidence that the Five-Year Rule reduces

1

competition in any relevant market or that Hasz has suffered an "antitrust injury" as a result of this reduction in competition. In fact, the eligibility rules do not reduce competition because the size of the pool of student-athletes who are eligible to play college football remains constant—the outgoing class of student-athletes like Hasz is replaced by a new incoming class of eligible student-athletes, rather than allowing older student-athletes to permanently crowd out newcomers. This constancy in the labor supply ensures that there is still robust competition to field teams, and that the product is still college football (as opposed to professional or semi-professional football).

Instead of demonstrating the anticompetitive nature of the Five-Year Rule, Hasz relies on past cases that found different NCAA rules, which limited student-athlete compensation, to be anticompetitive. But compensation rules are different from eligibility rules, and those cases are not controlling here. Contrary to this lawsuit's central premise, the fact that NCAA rules render Hasz ineligible to play an extra season does not make the rules anticompetitive under federal antitrust law merely because he might have earned NIL if he had played. Hasz's allegations of "harm" to ***himself*** do not demonstrate the requisite harm to ***competition***.

Second, Hasz does not make the requisite showing of irreparable harm. His loss of prospective NIL money and NFL opportunity is unsupported and speculative. Even if it were supported by evidence, it is compensable by money damages.

Third, Hasz does not make the requisite demonstrations that the balance of harms or public interest favors an injunction because giving Hasz the additional opportunity he requests will wrest that same opportunity from someone else and throw the NCAA's entire eligibility system into question.

Hasz's Motion should therefore be denied.

2

**RELEVANT FACTS**

**I.    THE NCAA'S ELIGIBILITY RULES ENSURE THAT ONLY BONA FIDE COLLEGE STUDENTS PARTICIPATE IN INTERCOLLEGIATE ATHLETICS**

The NCAA is a voluntary, self-governing association of approximately 1,100 member schools spread across three autonomous divisions (Division I, Division II, and Division III – DI, DII, and DIII, respectively).  Declaration of Jerry Vaughn ("Vaughn Decl.") ¶ 6.  For over a century, NCAA member schools have adopted rules to govern NCAA intercollegiate athletics to ensure fair and inclusive athletic competition and academic opportunities for collegiate student-athletes.  *Id.* ¶ 10.

Many of these rules address the benefits and services member schools may offer student-athletes and the transactions student-athletes can enter into with third-parties ("compensation rules").  These compensation rules have been litigated extensively in recent years.

But this case is not about rules regulating compensation or commercial transactions involving student-athletes.  Instead, this case is about "true" *eligibility* rules, which are designed to ensure NCAA athletes are bona fide college students, and that opportunities to participate remain available to student-athletes newly matriculating to colleges and universities from high school or other institutions during their allotted years of eligibility.  *Id* ¶ 14.

**A.    The Five-Year Rule Implements a Policy that NCAA Athletes Also Be Students**

The Five-Year Rule is an eligibility rule.  *Id.* ¶ 11.  Hasz challenges the Five-Year Rule, which limits a student-athlete to four seasons of competition within a five-year period of eligibility that begins with his full-time enrollment, and it counts any collegiate seasons towards these limits regardless of whether the seasons occurred at four-year or two-year institutions.  *Id.* (citing Ex. A Bylaws 12.8, 12.8.1).  The Five-Year Rule provides, in relevant part, as follows:

> **Bylaw 12.8 Seasons of Competition: Five-Year Rule.** A student-athlete *shall not engage in more than four seasons of intercollegiate competition in any one sport* (see Bylaws 12.02.6 and 14.3.3). An institution shall not permit a student-athlete to represent it in intercollegiate competition unless the individual completes all seasons of participation in all sports within the time periods specified below:
>
> **Bylaw 12.8.1 Five-Year Rule.** A student-athlete *shall complete the student-athlete's seasons of participation within five calendar years* from the beginning of the semester or quarter in which the student-athlete first registered for a minimum full-time program of studies in a collegiate institution . . . .

*Id.* Ex. A at 54 (emphasis added). A student-athlete's sports competition counts as "intercollegiate competition" regardless of whether it occurs on behalf of any "four-year collegiate institution" (such as a DI, DII, or DIII school) or on behalf of any "two-year institution" (such as a community college or junior college). *Id.* Ex. A at 34 (Bylaw 12.02.06) (defining "intercollegiate competition"); *see also id.* Ex. A at 140 (Bylaw 14.02.4) (defining "collegiate institution").

The Five-Year Rule is designed to align the student-athlete's period of athletic competition with that student-athlete's anticipated academic achievement and progress towards a college degree. A student-athlete's years of eligibility start upon full-time college enrollment and end when the student-athlete is expected to earn a baccalaureate degree. *Id.* ¶¶ 14-15.

Collectively, the eligibility requirements promote collegiate athletics and advance the fundamental purposes of the schools the student-athletes attend. *Id.* The eligibility requirements also allow the NCAA member schools to provide education-enhancing opportunities to 500,000 student-athletes overall and more than 180,000 student-athletes representing approximately 350 member schools across 26 sports in DI alone. *Id.* ¶ 7.

Hasz does not deny that the Five-Year Rule makes him not eligible to continuing playing football as a student athlete. Hasz played four seasons of DI football, and he used five seasons of eligibility. Hasz asks this Court to invalidate the rule for his benefit.

4

**B.      Waivers to the Five-Year Rule Are Available To Students Who Have Lost Seasons of Competition or Eligibility, But Not in Order to Get Extra Seasons**

The DI member schools and conferences have legislated some *limited* exceptions to the Five-Year Rules under specific circumstances, which allow students to be given back a complete season that they have lost due to extenuating circumstances, such as a medical hardship. *Id.* ¶ 16. NCAA members can apply to the NCAA for waivers of the pertinent rules for student-athletes who meet the criteria for these exceptions. *Id.* But the NCAA rules do not allow for granting a student-athlete extra years of eligibility above and beyond the five years allowed by the Five-Year Rule. *Id.*

Hasz does not argue that he meets the NCAA's criteria for an individualized waiver premised on extenuating circumstances. He instead argues that his first season at Buffalo would have been a redshirt year had he not already used a redshirt year at IWCC.[1] ECF 10 at 8. This theory would not overcome the five years of eligibility portion of the Five-Year Rule.

**C.      Division I Has Enacted Two General Waivers that Are Relevant Here**

**1.      Division I Already Approved a Waiver for the COVID Year of 2020 that Applies to Hasz**

COVID-19 created huge uncertainty for collegiate athletics. *Id.* ¶ 19. To address these impacts, the NCAA Division I Council and Board of Directors approved a COVID waiver permitting institutions to self-apply a season-of-competition and one-year extension of eligibility waiver for the 2020-21 seasons. *Id.* ¶ 21. The season did not count towards a student-athlete's

---

[1] This theory also highlights how Hasz' request for an injunction is untimely. If Hasz believed his 2021 season should not have counted towards the Five-Year Rule limitations, he has had four years to pursue that relief. *See Walker v. NCAA*, No. 3:25-cv-00514, ECF 20 (M.D. La. July 1, 2025).

four seasons of competition or five years of eligibility. *Id.* This waiver applies to the season of competition that Hasz completed in Spring 2021 at Iowa Western Community College. *Id.* ¶ 23.

**2.    In Response to the *Pavia* Lawsuit, Division I Approved a Limited Waiver Related to the Five-Year Rule that Does Not Apply to Hasz**

On November 12, 2024, a federal district court in Tennessee awarded Diego Pavia, the quarterback for Vanderbilt University ("VU"), a preliminary injunction prohibiting the NCAA from (a) counting a year that Pavia had played at a junior college ("JUCO") as a season of competition for purposes of the Five-Year Rule, and thereby (b) barring him from playing for VU for what would have been his fifth season of competition overall and his fourth season of DI competition. *Pavia v. NCAA,* 760 F. Supp. 3d 527, 544 (M.D. Tenn. 2024), *appeal pending*.

While the *Pavia* case was on appeal, the NCAA's Division I Board of Directors decided to grant a waiver to students similarly situated to Pavia to reduce uncertainty about their eligibility in 2025-26. Vaughn Decl. ¶ 22. This "JUCO Waiver" approved by the DI Board following *Pavia* gave another season of competition to DI student-athletes who, among other things, (i) used a season of competition at a two-year institution, (ii) were rostered during the 2024-25 season, and (iii) had not exhausted their five-year eligibility clock. *Id.* The JUCO Waiver does not apply to Hasz because he does not meet two requirements. First, Hasz did not use a season of competition at his two-year institution, Iowa Western Community College; instead, Hasz played four seasons at DI schools. *Id.* ¶ 23. Second, Hasz's five-year eligibility clock expired after the 2024 season. *Id.*

**II.    HASZ PLAYED FOUR FULL SEASONS OF COMPETITION IN DI FOOTBALL AND ALSO USED UP HIS FIVE-YEAR ELIGIBILITY CLOCK**

Hasz had a successful collegiate career, as a student and as an athlete. Hasz played four seasons of DI college football (two years at the University of Buffalo and two years at the University of Nevada, Las Vegas ("UNLV"), and used up all five of his seasons of eligibility.

6

*Id.*  The following chart shows Hasz's seasons of competition and years of eligibility (with running totals in parentheses):

| Jackson Hasz's College Football Career | | | | |
|---|---|---|---|---|
| Year | Enrolled Full Time | Played Football (Games Played) | Counts Towards 4 Seasons of Competition | Counts Towards 5 Years of Eligibility |
| 2019 | Iowa Western CC (JUCO) | No | No (Redshirt) | Yes (1st) |
| Spring 2021 (COVID) | Iowa Western CC (JUCO) | Yes (8 GP) | No (COVID Waiver) | No (COVID Waiver) |
| Fall 2021 | Buffalo (DI) | Yes (4 GP) | Yes (1st) | Yes (2nd) |
| 2022 | Buffalo (DI) | Yes (12 GP) | Yes (2nd) | Yes (3rd) |
| 2023 | UNLV (DI) | Yes (14 GP) | Yes (3rd) | Yes (4th) |
| 2024 | UNLV (DI) | Yes (14 GP) | Yes (4th) | Yes (5th) |

*Id.*

## III.    HASZ WANTS TO EARN MONEY BY GETTING A FIFTH SEASON OF COMPETITION AND A SIXTH SEASON OF ELIGIBILITY

Hasz wants an extra season of collegiate football because he received NIL compensation previously and has been "approached with offers for substantial additional NIL compensation if [he] would be eligible to play football during the 2025-26 season."  ECF 7-1 ¶ 13.  Hasz offers no documentary evidence or other affidavits to support these allegations.

In April 2025, the UNLV applied for an extension of eligibility waiver of the Five-Year Rule on Hasz's behalf.  Vaughn Decl. Ex. B.  The NCAA interpreted the basis for UNLV's request as follows:

1. Student-athlete would otherwise be eligible for an additional season of competition under the non-NCAA season of competition waiver related to the Pavia v. NCAA injunction;

2. Student athlete's experience and NIL earning potential while at a non-NCAA institutional [sic] are not equitable to those at his NCAA institution;

3. Granting [student-athlete] another season on his 5-year clock would allow for him to pursue additional graduate education options.

*Id.* ¶ 26.

An extension of eligibility waiver is to ensure athletes are given four seasons of participation opportunity. In order for a student-athlete to receive an extension, they must show they were denied two or more participation opportunities beyond their control or another extraordinary circumstance that would warrant relief. *Id*. ¶ 29.

On May 8, 2025, the NCAA denied the extension of eligibility waiver under Bylaw 12.8.7.1 on the following grounds:

**Rationale**

Requirements of the legislation are not satisfied:

Based on information submitted by Institution No. 3, SA was not denied at least two participation opportunities. The purpose of extension legislation is to ensure four seasons of participation opportunity. In order for an SA to receive an extension an institution must demonstrate SA was denied at least two participation opportunities for reasons beyond the control of SA or institution, resulting in SA not having at least four participation opportunities. While staff considered 2019-20 academic year a denied participation opportunity given SA did not compete and Institution No. 1's associate athletics director confirmed SA was participating with team and was otherwise eligible for competition, Institution No. 3 was unable to demonstrate SA was denied an additional participation opportunity. Specifically, SA had at least four participation opportunities including 2021-22, 2022-23, 2023-24 and 2024-25 academic years when he competed. In addition, staff noted the 2020-21 academic year cannot be considered a denied participation opportunity in the traditional extension analysis given SA received self-applied COVID-19 relief for that season.

*Id.* Ex. C at 1.

The NCAA also considered and rejected UNLV's request that Hasz be granted an additional season of competition and eligibility under the JUCO Waiver:

> Further, staff reviewed the December 23, 2024 waiver provided by the NCAA Division I Board of Directors (BOD) permitting SAs who attended and competed at a non-NCAA school for one or more years to remain eligible and compete in 2025-26 if those SAs would have otherwise used their final season of competition during the 2024-25 academic year, and meet all other eligibility requirements (e.g., progress toward degree, five-year period of eligibility, etc.). Staff noted SA does not meet [JUCO] waiver given he never competed at a non-NCAA school, and he does not meet "all other eligibility requirements" as his five-year period of eligibility has expired. Additionally, SA does not have two denied participation opportunities to warrant approval of an extension of eligibility. Finally, Institution No. 3 was unable to demonstrate otherwise extraordinary circumstances to warrant approving the waiver.

*Id.*

While an appeal process is available, UNLV did not appeal the denial of the waiver request. *Id.* ¶ 31. Instead, Hasz brought this action and filed this motion.

## ARGUMENT

## I.    HASZ'S MOTION IS SUBJECT TO A HEIGHTENED STANDARD OF PROOF BECAUSE IT WOULD ALTER THE STATUS QUO

A preliminary injunction is designed to "preserve the status quo until, upon final hearing, a court may grant full, effective relief." *Rathmann Grp. v. Tanenbaum*, 889 F.2d 787, 790 (8th Cir. 1989) (citing *Ferry-Morse Seed Co. v. Food Corn, Inc.*, 729 F.2d 589, 593 (8th Cir. 1984)). Preliminary injunctions may be mandatory or prohibitory. *Chisano v. Newton*, No. 4:23-CV-3133, 2024 WL 2092000, at *3 (D. Neb. May 9, 2024). There is a heightened standard to issue a mandatory injunction because it requires "a party 'to take affirmative action … [which] goes beyond the purpose of a *preliminary* injunction." *Sanborn Mfg. Co., Inc. v. Campbell Hausfeld/Scott Fetzer Co.*, 997 F.2d 484, 490 (8th Cir. 1993)). "[A] mandatory preliminary injunction at the preliminary of the proceeding should only be granted in rare instances where the facts and law are clearly in favor of the moving party, especially if the grant of the temporary

injunction would in effect give the plaintiff the relief which he seeks in the main case." *Bricklayers, Masons, Marble & Tile Setters, Protective & Benevolent Union v. Lueder Constr. Co.,* 346 F. Supp. 558, 561 (D. Neb. 1972) (internal citations omitted).

Hasz requests a mandatory injunction because he asks the Court to alter the status quo by granting him both an extra (fifth) season of competition and extra (sixth) season of eligibility for the 2025 football season, which is also the final relief he seeks. Other federal district courts have denied substantially similar requests for preliminary injunctive relief on the grounds that such requests were for mandatory relief. *See Coley v. NCAA,* No. 5:25-CV-98-D, 2025 WL 1616719, at *10 (E.D.N.C. June 6, 2025); *Brzovic v. NCAA*, No. 2:25-cv-02885-DCN, 2025 WL 1370758, at *2 (D.S.C. May 11, 2025); *see also Johnson*, No. 25-60-M-KLD, 2025 WL 1790345, at *7 (The plaintiff is asking the Court "to prevent the NCAA from enforcing the Five-Year Rules that are currently in effect and alter the status quo by granting him an additional season he is not presently entitled to.").

## II.    HASZ FAILS TO MEET THE HEIGHTENED STANDARDS FOR PRELIMINARY INJUNCTIVE RELIEF

Federal Rule of Civil Procedure 65 authorizes federal courts to issue preliminary injunctions. Because a preliminary injunction is an "extraordinary remedy," it should be "granted sparingly, and under strict rules." *Enquist v. Quaker Oats Co.,* 327 F. Supp. 347, 349 (D. Neb. 1971). A plaintiff seeking such relief must clearly demonstrate that (1) he is likely to succeed on the merits, (2) he is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Dataphase Sys. v. C L Sys.*, 640 F.2d 109, 113 (8th Cir. 1981). "[T]he harm must not only be 'more than a mere possibility' of irreparable harm, it also 'must be more than mere speculation.'" *H&R Block, Inc. v. Block, Inc.*, 58 F.4th 939, 951 (8th Cir. 2023) (quoting *Padda*

10

*v. Becerra*, 37 F.4th 1376, 1384 (8th Cir. 2022)).  "Failure to demonstrate irreparable harm is a sufficient ground to deny a preliminary injunction."  *GMC v. Harry Brown's, LLC*, 563 F.3d 312, 320 (8th Cir. 2009)).

Here, Hasz does not satisfy any of the four *Dataphase* elements, let alone the heightened standard applicable to the requested mandatory injunction.  Each of these failures is fatal to Hasz's request for injunctive relief both individually and without a doubt in the collective.

## A.    Hasz Cannot Show a Likelihood of Success on His Antitrust Claim

Hasz's motion fails at the first *Dataphase* standard because he cannot show a likelihood of success on his antitrust claims.

### 1.    The Five-Year Rule Is Not Subject to Antitrust Scrutiny

The Sherman Act prohibits only unreasonable restraints of "trade or commerce." 15 U.S.C. § 1.  Commercial activity is "activity from which the actor anticipates economic gain." *O'Bannon v. NCAA*, 802 F.3d 1049, 1065 (9th Cir. 2015).

As the Ninth Circuit noted in *O'Bannon*, NCAA member institutions enact both commercial rules (e.g., rules regulating player compensation) and noncommercial rules (e.g., rules that determine player eligibility).  *Id.* at 1066.  The Five-Year Rule is a noncommercial eligibility rule.  As *O'Bannon* put it, rules "*limiting the number of years that student-athletes may play collegiate sports*" are "*true eligibility rule[s]*" that do not raise antitrust concerns under the Sherman Act.  *Id.* at 1066 (emphasis added).

*O'Bannon's* reasoning is consistent with decisions by other courts. *Smith v. NCAA*, 139 F. 3d 180, 187 (3d Cir. 1998) (holding that "the eligibility rules are not related to the NCAA's commercial or business activities" and Sherman Act does not apply); *Coley v NCAA*, 2025 WL 1616719, at *5 ("[T]he Sherman Act does not apply to the [Five-Year Rule].");  *Goldstein v*

*NCAA*, No. 325-CV-00027-TES, 2025 WL 662809, at *4 (M.D. Ga. Feb 28, 2025); *Gaines v NCAA*, 746 F Supp 738, 745 (M.D. Tenn. 1990) (rules denying eligibility to student-athletes who entered professional sports draft or hired an agent were not "subject to scrutiny" under the Sherman Act); *Jones v NCAA*, 392 F. Supp. 295, 303 (D. Mass. 1975); *Johnson*, 2025 WL 1790345, at *9.

Hasz argues that the Supreme Court's decision in *NCAA v. Alston*, 594 U.S. 69 (2021) changed this analysis, but Hasz overstates *Alston*.  In *Alston*, the Supreme Court focused exclusively on the NCAA's compensation rules, and only a "a narrow subset" of them at that. *Id.* at 108 (Kavanaugh, J., concurring).  The *Alston* decision does not analyze, much less determine, the legality of NCAA's eligibility rules generally or the Five-Year Rule specifically.  *See Goldstein*, 2025 WL 662809, at *4 (noting that *Alston* is "more scalpel than ax" and "didn't touch" the NCAA's eligibility rules); *Osuna Sanchez v. NCAA*, No. 3:25-cv-62, 2025 WL 684271, at *3 (E.D. Tenn. Mar. 3, 2025) ("Nothing in *Alston* states that all NCAA eligibility rules are commercial in nature."); *Brzovic*, 2025 WL 1370758, at *4 ("Brzovic argues that the court should view the Five-Year Rule as commercial in nature and purpose, rather than merely an eligibility rule, following the Supreme Court's decision in *Alston*, 594 U.S. 69.  The court disagrees.); *see also Johnson v. NCAA*, 2025 WL 1790345 at *10 ("As *O'Bannon* instructs, the [Five-Year Rules] are true eligibility rules and nothing in *Alston* changes that. Because the Challenged Rules are true eligibility rules, they are not commercial in nature and are not subject to antitrust scrutiny under the Sherman Act.").

The Five-Year Rule is a true eligibility rule, and *Alston* did not change that. Eligibility rules are beyond the scope of the Sherman Act or can be approved on a quick look analysis. As taught by *O'Bannon*, with support from the appellate court decisions in *Smith* and *Banks*, and the

district court decisions in *Coley*, *Goldstein*, *Osuna Sanchez*, *Brzovic*, *Bowers*, *Johnson*, and *Gaines*, they are – and remain – outside the purview of the Sherman Act.

### 2.    The Five-Year Rule Survives Rule of Reason Analysis

Even if this Court applies antitrust scrutiny to the Five-Year Rule, Hasz still fails to demonstrate he is likely to succeed.

The threshold issue of antitrust analysis is whether the challenged conduct must be evaluated under the *per se* standard or rule-of-reason standard. *Per se* analysis applies only to a limited set of "horizontal agreements"—i.e., agreements between competitors at the same level of distribution – that the courts have determined through long experience "always or almost always tend to restrict competition and decrease output." *Ohio v. Am. Express Co.*, 585 U.S. 529, 540 (2018). Rule-of-reason analysis applies to every other type of restraint, and it requires courts to conduct a fact-specific assessment of market structure, market power, and actual effects on competition to determine whether the restraint is unreasonable. *Id.* at 540 – 541.

Hasz makes an offhand argument that *per se* analysis could apply, ECF 6, but he proceeds to apply the rule of reason analysis because it is the proper framework for NCAA rules subject to antitrust scrutiny. *Alston*, 594 U.S. at 92-95; *NCAA v. Board of Regents*, 468 U.S. 85, 103, 117 (1984). Under the applicable rule of reason test at the preliminary injunction phase, the Court must assess the likelihood that Hasz will ultimately be able to show that the Five-Year Rule harms competition itself (and not merely Hasz alone).

Applying the rule of reason is a three-step, burden shifting exercise. *Am. Express*, 585 U.S. at 541. "Under this framework, the plaintiff has the initial burden to prove that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market." *Id.* Thus, Step 1 of the rule of reason analysis requires a fact-specific assessment of

market structure, market power, and actual effects on competition to assess anticompetitive effects. *Id.*

"If the plaintiff carries its burden [at Step 1], then the burden shifts to the defendant [at Step 2] to show a procompetitive rationale for the restraint." *Id.* at 542. "If the defendant makes this showing [at Step 2], then the burden shifts back to the plaintiff [at Step 3] to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id.* at 541.

### (a)    Hasz Does Not Offer Evidence of Anticompetitive Effects in a Relevant Market

Hasz's obligation to present evidence of substantial anticompetitive effects at Step 1 of the rule of reason analysis "is no slight burden." *Alston*, 594 U.S. at 97. *Alston* noted that "courts have disposed of nearly all rule of reason cases in the last 45 years on the ground that the plaintiff failed to show a substantial anticompetitive effect"—in fact, "courts have decided 90% (809 of 897) on this ground." *Id.* at 543 (internal citation and quotation marks omitted).

Here, Hasz's claim fails at Step 1 because Hasz has presented no evidence of the relevant market and he has provided no evidence at all about any substantial anticompetitive effect caused by the Five-Year Rule in that unsubstantiated market. *See Zeigler*, No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952, at *5 (E.D. Tenn. June 26, 2025); *Johnson*, 2025 WL 1790345, at *14; *Coley*, 2025 WL 1616719, at *10.

Before a district court can assess whether a rule has an anticompetitive effect, it "must first define the relevant market." *Am. Express Co.*, 585 U.S. at 542 (cleaned up). Without defining the relevant market, "there is no way to measure the defendant's ability to lessen or destroy competition." *Id.* at 543 (emphasis added).

14

Hasz has the burden of proving the scope of the relevant market, which has two components: a product or service component and a geographic component. *Western Parcel Express v. UPS of Am.*, 65 F.Supp.2d 1052, 1058 (N.D. Cal. 1998) (citing *United States v. Grinnell*, 384 U.S. 563, 575-76 (1966)). Defining a relevant market involves such considerations as "the reasonable interchangeability of use or cross-elasticity of demand between the product itself and substitutes for it," *United States v. Archer-Daniels-Midland Co.*, 866 F.2d 242, 246 (8th Cir. 1988) (quoting *Brown Shoe v. United States*, 370 U.S. 294, 325 (1962)), and the "geographic area where consumers can practically seek alternative sources of the product and it can be defined as 'the market area in which the seller operates.'" *Double D Spotting Serv. v. Supervalu, Inc.,* 136 F.3d 554,560 (8th Cir. 1998) (*quoting Tampa Elec. Co.v. Nashville Coal Co.*, 365 U.S. 320, 327 (1961)).

The validity of a proposed relevant market is a factual determination. *Little Rock Cardiology Clinic PA v. Baptist Health*, 591 F.3d 591, 599 (8th Cir. 2009). As a practical matter, economists or experts are typically necessary to explain the relevant market and to measure the impact of the allegedly illegal conduct. *Goldstein*, 2025 WL 662809, at *5.

Here, Hasz merely asserts—without expert testimony or even any supporting evidence—anticompetitive effects in two different relevant markets: (1) a U.S. labor market for DI football players, and (2) a nationwide consumer market for watching college football games.

15

(i)    **Hasz's Alleged U.S. Labor Market for Division I Football Players Is Unsupported, and He Fails to Show Anticompetitive Effects in Such a Market**

Hasz argues that one relevant market is "the labor market for football players seeking to compete at the NCAA Division I level."[2]  ECF 6 at 17.  But Hasz does not offer any evidence showing a product market limited to DI football players.  For example, Hasz himself formerly attended a community college for two years, where he participated in football activities and used one of his five seasons of eligibility.  Vaughn Decl. ¶ 23.  Further, Hasz's motion evinces an aspiration to play professional football, Doc. 6 at 13-14, and Hasz is now unquestionably eligible to declare for the NFL draft or play in other professional football leagues.  *Id.* ¶ 24.  These facts imply that there is demand for the same pool of football players among collegiate institutions inside and outside the NCAA, and between the NCAA and professional leagues.  The appropriate market definition should account for substitutions of supply and demand for football players in these different colleges and leagues.

Instead of doing the work to define a relevant labor market, Hasz wants to piggyback on the market definition in *Alston* and cases after it.  *See* Doc. 6 at 17-18 (citing *Ohio v. NCAA*, 706 F. Supp. 3d 593 (N.D. W. Va. 2023) and *Alston*).  The doctrine of issue preclusion determines whether an issue decided in a prior case is binding on a party to a subsequent case.  When an issue is not actually litigated or ultimately decided in a prior case, it is not binding in a subsequent case.  *Fofana v. Mayorkas*, 4 F.4th 668, 671 (8th Cir. 2021) (quoting *Janjua v.*

---

[2] Hasz fails to allege any facts to support the geographic component of this labor market, alleging only that NCAA member institutions exist "nationwide."  ECF 6 at 17.  But this conclusory assertion ignores the facts that NCAA schools recruit foreign players and that foreign players try to play NCAA football.  Vaughn Decl. ¶ 8.  This is why the NCAA defines "collegiate institution" to include schools in foreign countries.  *Id.* (citing Ex. A. at 140 (Bylaw 14.02.4(c))).  Some former NCAA players go on to play in foreign leagues, highlighting the global breadth of the labor market for the same athletes.

*Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019) ("for an issue to be "actually litigated," the issue must have been "raised, contested, and submitted for determination" in the prior proceeding"). Here, the NCAA is not bound by the market definition in *Alston* because, in *Alston*, the court found that the market-definition issue was admitted. *Id*. Likewise, the NCAA is not bound by the market definition in *Ohio* because *Ohio* was merely a ruling on a motion for temporary restraining order until a hearing on the preliminary injunction occurred, and the market-definition issue ultimately was not decided. *Ohio v. NCAA*, 706 F. Supp. at 602. Hasz is therefore unlikely to succeed on the merits of his labor market definition.

Even if Hasz were credited with demonstrating the existence of a labor market, he still must show anticompetitive effects based on admissible evidence, *Johnson*, 2025 WL 1790345, at *12. But Hasz offers no expert testimony or other evidence that the Five-Year Rule has any adverse impact whatsoever on competition in his proposed labor market.

### (A)    Eligibility Rules Create Competition and Are Not "Anticompetitive"

Hasz argues that restrictions on who can compete, and for how long, ultimately limit opportunities for the competitors. Doc. 6 at 19 (citing *Pavia*, 760 F. Supp. 3d at 541). This argument misunderstands the relationship between eligibility and competition. Eligibility rules define the type of athletic competition that is being produced—whether it is NCAA men's

17

college football, women's professional basketball (WNBA), the Paralympics, or age-based sports (like the Senior PGA Tour).[3]

Eligibility rules thus create the parameters for upstream competition to supply inputs for the "product" of athletic competition.  Therefore, the proper antitrust analysis is to judge whether upstream competition to obtain or provide labor for the defined product has been reduced or not (e.g., by limiting compensation of student-athletes); not whether the number of upstream competitors can be increased or not by changing the product definition (e.g., by changing eligibility rules).  To put it another way, a manufacturer is not required to increase the number of parts in its existing products, or to create a brand-new product, merely to create opportunities for would-be suppliers.  Likewise, an employer is not required to hire people who lack the types of skills and talents that the employer deems necessary to its business merely to create opportunities for would-be employees.  Here, the NCAA has determined that only student-athletes who satisfy the Five-Year Rule can produce NCAA sports, and the NCAA's decision is not "anticompetitive" just because some people do not meet, or no longer meet, the student-athlete eligibility requirements.

Hasz's argument also has no limiting principle because, if accepted, it would invalidate every conceivable eligibility rule to play sports.  Why shouldn't every person be allowed to

---

[3] These types of organizations derive their value precisely from exhibiting competition that is limited to certain classes of people.  *See e.g.*, *White v. NFL Players Ass'n*, 756 F.3d 585, 588 (8th Cir. 2014) ("The college draft, for instance, allows the worst professional teams to select the best college players. . . This rule promotes league-wide parity even as it restrains a player's freedom to choose which team to play for. Because facially anticompetitive league rules like these can have counterintuitively procompetitive effects, courts are often hesitant to second-guess League decisions from an antitrust perspective, preferring instead to evaluate League Conduct under the deferential Rule of Reason"); *Niemann v. Carlsen*, No. 4:22-cv-01110-AGF, 2023 WL 4198227 at *11, (E.D. Mo. June 27, 2023) (concluding that banning a group from a competitive chess platform as enforcement of its anti-cheating rule was essential to promoting fair competition).

compete in every athletic activity?  On Hasz's view, the elimination of eligibility rules would increase the amount of "competition" in athletic contests that ultimately are sold to spectators. But even if this were true in some sense, it does not mean that this is a type of "competition" that matters to antitrust law or that antitrust law compels market participants to eliminate all eligibility rules that bar such unlimited, universal competition.  Different types of athletic competition create product variety, enhance consumer choice, and ultimately increase output— because many competitors would choose *not* to compete if they were always forced to compete with talent that was "out of their league."

### (B)    Hasz Shows No Anticompetitive Effects in His Labor Market

Hasz tries to avoid the extreme (and absurd) consequences of his generic attack on eligibility rules by arguing, more specifically, that the Five-Year Rule unfairly reduces competition for NIL deals by former JUCO students whose time competing at the DI level is reduced by their time spent competing at JUCOs.[4]  ECF 6 at 20.  But this argument does not apply to Hasz—he played four full seasons of DI football.  Although Hasz began college at a JUCO in 2019 and played a season at the JUCO in Spring of 2021, these facts did not deprive Hasz of four full seasons of competition in NCAA DI football.  Hasz lacks standing to assert a claim based on an injury he did not suffer.  *Midwest Comm'ns, Inc. v. Minnesota Twins, Inc.*, 779 F.2d 444, 451 (8th Cir. 1985).

Regardless, the Five-Year Rule does not injure competition among football players for spots on DI teams by excluding individual players like Hasz, and Hasz does not show otherwise.

---

[4] Hasz also argues that the Five-Year Rule somehow "harms" student-athletes who are "deciding" whether to attend a JUCO or compete for a JUCO, ECF 6 at 20, but Hasz does not explain how these are either injuries to competition or injuries that arise from a reduction in relevant competition.

Hasz is merely one player among thousands. His presence or absence in the pool of potentially eligible players has no impact on the degree of competition for scholarships or roster spots (except, at least, for the currently eligible athlete that Hasz will bump off the team if he gets an extra season). The Sherman Act protects "competition, not competitors." *Par v. Wolfe Clinic, P.C.*, 70 F.4th 441, 446 (8th Cir. 2023) (quoting *Brown Shoe Co. v. United States*, 370 U.S. 294, 344 (1962)). Hasz's ineligibility does not injure competition for scholarships and roster spots; it injures only one competitor, Hasz himself. "And harm to one competitor does not itself indicate harm to competition." *Razorback Ready Mix Concrete Co., Inc. v. Weaver*, 761 F.2d 484, 488 (8th Cir. 1985).

Nor does the Five-Year Rule injure competition among football players by excluding a whole set of players who, like Hasz, are no longer eligible. The outgoing set of now-ineligible players will be replaced by an incoming set of eligible players entering those DI programs, and the level of competition will remain the same. A firm's business decision to change suppliers may injure some suppliers, but it does not injure competition. *Johnson*, 2025 WL 1790345, at *13 (citing *Fieler v. Chrysler Corp.*, No. C 93-3797, 1994 WL 478721, at *2 (N.D. Cal. Aug. 24, 1994) ("The replacement of one supplier by another, even if financial harmful to the former supplier, does not constitute antitrust injury.")). Hasz fails to offer evidence to support a different conclusion.

Hasz also fails to offer evidence that the Five-Year Rule prevents or reduces competition among NCAA schools for football players. Even if it were supported by evidence, this argument is unlikely to succeed because Hasz's allegation is contrary to basic economics. The effect of the Five-Year Rule is to limit the number of athletes who can participate in college football (because athletes not deemed "students" under NCAA rules are not eligible), while leaving the number of

NCAA member schools the same.  Because the Five-Year Rule limits the supply of football

players to *eligible* student-athletes, it maintains an equilibrium between supply and demand.  If

the Five-Year Rule were eliminated, as Hasz advocates, then the supply of newly eligible

(formerly ineligible) athletes would increase dramatically relative to demand.  When supply

increases relative to demand, prices tend to fall—because there is less demand-side competition

relative to supply.  What Hasz advocates would therefore tend to reduce competition among

schools for players like Hasz.[5]  *See Arbolida v. NCAA*, No. 25-2079-JWB, 2025 WL 579830, at

*3 (D. Kan. Feb. 21, 2025).

The Five-Year Rule is not a competition-reducing restraint by which NCAA schools

cause anticompetitive effects—like "producing less college football" or "paying players less

money." Hasz does not allege that the Five-Year Rule ever deprived players of the opportunity,

during their periods of eligibility, from competing for DI opportunities.  Nor does Hasz allege

that the Five-Year Rule prevented DI schools from competing for these players' services while

they were eligible.  The only injury is that, by virtue of their end of their of eligibility, the players

can no longer play and (perhaps) earn NIL money. This is not an injury that arises from any

reduction in competition.  What Hasz wants is that the eligibility line be re-drawn to include him,

but not to include anybody else like him who might compete for the same NIL money.  This is

not a remedy that antitrust law should employ because it does not protect competition generally,

it merely picks winners and losers.

---

[5] On this issue, the *Fourqurean* court erred when it concluded, without an evidentiary record,
that the Five-Year Rule causes anticompetitive effects by limiting who is eligible to play. 2025
WL 993975, at *4. The U.S. Court of Appeals for the Seventh Circuit has the NCAA's appeal
under advisement.

        **(ii)**      **Hasz's Proposed Nationwide Consumer Market Is Similarly Unsupported, and He Also Fails to Show Anticompetitive Effects in Such a Market**

Hasz asserts that a second relevant market is the "nationwide market for consumption of college football." ECF 6 at 21. But, once again, Hasz offers no expert testimony or facts to support the existence of this market. *See Goldstein v NCAA*, 2025 WL 662809 at *5 ("expert assessment ties directly to [the plaintiff's] antitrust claim and his likelihood of success on the merits as it relates to obtain a preliminary injunction."). For example, Hasz offers no expert analysis of what entertainment options viewers substitute for college football when college football games are unavailable, and vice versa. Because Hasz offers no evidence in support of his proposed consumer market definitions, Hasz is unlikely to succeed on the merits of his antitrust claim based on his alleged consumer market.

Hasz also fails to show any anticompetitive effects in his alleged consumer market. Hasz argues that the Five-Year Rule's application to JUCO transfers like him causes negative downstream effects on consumers who attend or watch college football games because "[t]eams may be less competitive without the ability to retain skilled transfer players for an additional season, fans lose the opportunity to see those college athletes compete for their favorite teams on gameday, and the product of NCAA athletics is less compelling for consumers." ECF 6 at 21. But this is sheer speculation. Hasz offers no expert testimony or other evidence that the presence or absence of JUCO transfers on DI college football teams affects the value of the college football games to consumers. Nor is there any evidence in the record that the Five-Year Rules have any adverse impact whatsoever on the price, availability, variety, or quality of NCAA football. *See Ciulla-Hall v. NCAA*, No. 25-cv-10271-DJC, 2025 WL438707, at *2 (finding the court lacked a factual record necessary to perform the required analysis regarding market power and power structure to assess if the plaintiff's "circumstances reflect[ed] harm to market-wide

competition in a well-defined antitrust market.").  This absence of evidence is dispositive. *Johnson*, 2025 WL 1790345, at *14.

Hasz's argument also proves too much. If antitrust law were to demand that DI college football teams field the best possible players, then antitrust law would demand not only unlimited DI eligibility for former JUCO players, but also unlimited DI eligibility for former DI, DII, and DIII players too, including current professional football players.  The problem is not solved by Hasz's proposal to limit the applicability of the Five-Year Rule to registration for classes at an NCAA member institution, ECF 6 at 23, because this would enable student-athletes to play several seasons of college football—football at junior colleges or non-member institutions before then transferring to an NCAA member school.  College football careers would become longer than many professional football careers.

### (b)    Hasz Has Not Suffered Antitrust Injury

Hasz has not shown anticompetitive effects, but even if he had, he must show something more: antitrust injury. This is not the same thing as injury-in-fact.  Antitrust injury is a personal injury that that arises from a reduction in competition that the antitrust laws were designed to prevent.  *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977).

Hasz's injury does not arise because the Five-Year Rule harmed a type of competition that the antitrust laws were designed to protect.  Hasz's alleged "injury" is merely that he is no longer eligible to play.  Therefore, Hasz has not suffered the requisite antitrust injury.  *National Ass'n of Review Appraisers & Mortgage Underwriters v. Appraisal Found.*, 64 F.3d 1130, 134-35 (8th Cir. 1995) ("[I]ncidental harm to an individual competing in the market is a necessary residuum of the competitive process.  In such an environment one competitor will always suffer some form of "harm" relative to a competitor that gains an advantage"); *Johnson*, 2025 U.S. 2025 WL 1790345, at *13 ("Although the Challenged Rules undeniably affect [plaintiff], he has

not shown that his ineligibility has any impact on the degree of competition between the pool of potentially eligible players.").

(c)    **The Five-Year Rule Is Procompetitive Because It Creates the "Product" that NCAA Members Offer and Increases Competition among Member Schools for Players**

At Step 2 of the rule of reason analysis, a defendant bears the burden to demonstrate that its conduct is supported by substantial procompetitive effects. The Court need not proceed to Step 2, as Hasz has failed to produce any evidence to meet his burden at Step 1, let alone that the heightened standard required a requested mandatory injunction, *Sanborn*, 997 F. 2d at 490. Even if Hasz had met his burden at Step 1, the substantial and judicially recognized procompetitive justifications for eligibility rules like the Five-Year Rule substantially outweigh anticompetitive effects at Step 2 of the analysis.

First, courts have recognized that eligibility rules are procompetitive because they expand output by creating and preserving college athletics as a unique offering from professional sports. For example, the Seventh Circuit in *Agnew v. NCAA*, citing decisions from several federal courts of appeals, explained that "[m]ost – if not all – eligibility rules . . . fall comfortably within the presumption of procompetitiveness afforded to certain NCAA regulations" because those regulations "in college [sports]" are "necessary for the product to exist." 683 F3d 328, 342–43 (7th Cir. 2012). Indeed, eligibility rules go to the crux of what it means to be a student-athlete and they are therefore "essential to the very existence of the product of college football." *Id.* at 343; *see also Alston,* 594 U.S. 69 at 70; *Board of Regents*, 468 U.S. at 101; *Banks v. NCAA*, 977 F2d 1081, 1089 (7th Cir. 1992) (most NCAA bylaws "are procompetitive because they enhance public interest in intercollegiate athletics"). This increases the quality of output for college football players. For without eligibility rules defining what it means to be a "student-athlete," the NCAA would be just another minor league or feeder system to professional sports leagues,

24

which may reduce fan interest and, ultimately, the resources invested in (and financial opportunities available to) student-athletes. *Banks*, 977 F2d at 1090.

Second, the Five-Year Rule enhances access to college football and improve the student-athlete experience by ensuring more prospective student-athletes can enjoy that experience. The Five-Year Rule strikes an appropriate balance by ensuring that student-athletes across all sports may excel on and off the field, secure a degree, and then move on to the next phase of their lives, making room for the next wave of student-athletes to experience those same life-changing opportunities. Stated differently, if players (like Hasz) are afforded additional seasons of competition, they will get them at the expense – and compensation – of new student-athletes hoping to benefit instead.[6]

Finally, the Five-Year Rule also improves quality of output by fostering better alignment between athletics and academics. *See Johnson*, 2025 WL 1790345 at *15 ("The NCAA has demonstrated that linking eligibility to compete in college athletics with academic progress – thereby integrating athletics with academics – is a legitimate procompetitive rationale for the Challenged Rules."); *accord McCormack v NCAA*, 845 F 2d 1338, 1344-45 (5th Cir.1988); *Bowers v NCAA*, 974 F Supp 459, 461 (D.N.J. 1997).

> **(d)     There Exists No Substantially Less Restrictive Means by Which the NCAA Could Achieve the Procompetitive Benefits of the Five-Year Rule**

*Alston* underscored that courts should not lightly second-guess NCAA rules:

> We agree with the NCAA's premise that antitrust law does not require businesses to use anything like the least restrictive means of achieving legitimate business

---

[6] Given the finite nature of the opportunities to play college football, the Five-Year Rule, if anything, *increases* competition among those competing – and paying – for talented student-athletes. *Arbolida*, 2025 WL 579830, at *4 (observing that "effect of the challenged rules is to increase competition, at least as between schools competing for talent in the student athlete labor market").

purposes. To the contrary, courts should not second-guess "degrees of reasonable necessity" so that "the lawfulness of conduct turn[s] upon judgments of degrees of efficiency." That would be a recipe for disaster, for a "skilled lawyer" will "have little difficulty imagining possible less restrictive alternatives to most joint arrangements." And judicial acceptance of such imaginings would risk interfering "with the legitimate objectives at issue" without "adding that much to competition."

594 U.S. at 99 (citations omitted); *Board of Regents*, 489 U.S. at 120 (NCAA needs "ample latitude" to play its role); *see also Race Tires Am., Inc. v. Hoosier Racing Tire Corp.*, 614 F.3d 57, 83 (3d Cir. 2010) ("[S]ports-related organizations should have the right to determine for themselves the set of rules that they believe best advance their respective sport").

Therefore, at Step 3 of the rule of reason analysis, Hasz bears a heavy burden to demonstrate that (1) the Five-Year Rule is "patently and inexplicably stricter than is necessary to achieve the procompetitive benefits," *Alston*, 594 U.S. at 101 (cleaned up), and (2) Plaintiff's alternative is a "substantially less restrictive alternative" to "achieve the same procompetitive benefits… proved at the second step." *In re Pork Antitrust Litig.,* No. 18-1776(JRT/JFD), 2025 WL 1224694, at *78 (D. Minn. Apr. 28, 2025) (citing *Alston* 594 U.S. at 98). Hasz fails to meet either of these high standards.

The Five-Year Rule is not patently and inexplicably stricter than necessary. The 4-in-5 standard of the Five-Year Rule reasonably ensures that student-athletes' athletic careers align with their college enrollment and progress toward a four-year degree. It is also reasonable to commence the Five-Year Rule upon a student-athlete's enrollment in any collegiate institution, not merely the NCAA, because there are many schools outside of the NCAA, including many

26

four-year schools.[7]  If the Five-Year Rule did not apply to competition at non-NCAA schools,

then a student-athlete could play multiple seasons of college football in non-NCAA schools and

retain full eligibility upon enrollment at an NCAA school.  The results would be that college

football careers would be longer than many professional football careers, and incoming and

newly eligible student-athletes from high school would be competing against older and more

experienced players.

Hasz nevertheless argues that the Five-Year Rule should not apply to competition at non-

NCAA schools and should only start upon a student-athlete's enrollment in an NCAA school.

Doc. 8 at 23.  This proposal is not a "substantially less restrictive alternative" that would

"achieve the same procompetitive benefits" of the current Five-Year Rule because it ignores that

student-athletes could compete indefinitely at JUCOs before commencing their four-year NCAA

career.  The change would fundamentally alter the character of NCAA student-athletes and be

unfair to NCAA student-athletes who do not want to gain additional pre-NCAA sports

experience at non-NCAA schools.  Further, it is worth noting that this argument, if accepted,

would not make Hasz eligible because he has already used all four of his NCAA seasons of

competition.

Hasz also argues that the four seasons of competition allowed by the Five-Year Rule

should be changed to five seasons of competition (so that it would be a 5-in-5 rule), ECF at 24,

but this would simply substitute one arguably arbitrary number for another.  Hasz does not

---

[7] The Court may take judicial notice that there more than 500 member schools in the National
Junior College Athletic Association, see NJCAA, and 237 member institutions in the National
Association of Intercollegiate Athletics ("NAIA"), *see* NAIA Schools: A Complete List by City
and State. *See Twin Cities Safety, LLC v. Moe*, 139 F.4th 1015, 1019 n.6 (8th Cir. 2025) (noting
when neither party disputes the accuracy of public content on public websites, the court can take
judicial notice).

explain why a 5-in-5 rule that would satisfy him would not be unacceptable to a player that wants a sixth year of competition and eligibility – and advances the same arguments that Hasz advances here.  Any change to a 5-in-5 or 6-in-6 or other rule would disadvantage newly eligible student-athletes whose scholarships and roster spots would now be taken by holdovers like Hasz. Courts are not specialists in college athletics and are not well-suited to re-drafting rules like this; this is why *Alston* warns strongly against it.  594 U.S. at 99.

For the same reason, granting individual relief to Hasz does not constitute a viable "less restrictive means."  *See Johnson v. NCAA*, 2025 WL 1790345 at *15 ("But as countered by the NCAA, Johnson's one-person exception would represent a metering of "'small deviations'" to achieve the procompetitive benefits of the Five-Year Rule, which *Alston* instructs is "not an appropriate antitrust function.").

Hasz also argues that the same JUCO transfer requirements should be enforced when transferring from a JUCO as when transferring from one NCAA school to another.  *Id*. However, Hasz fails to explain what transfer rules he would like changed or how this proposal is procompetitive.  Whether it's a change in transfer rules or the start of the eligibility clock does not start until a student registers for classes at a member institution, Hasz's proposed rule will disadvantage newly eligible student-athletes whose scholarships and roster spots would now be taken by holdovers like Hasz.

### B.    Hasz Will Not Suffer Irreparable Harm If His Motion Is Denied

The burden is on the defendant to demonstrate that the threat of irreparable harm "is certain and great and of such imminence that there is a clear and present need for equitable relief."  *Roudachevski v. All-American Care Ctrs., Inc.*, 648 F.3d 701, 706 (8th Cir. 2011) (internal citations omitted).  The lack of irreparable harm is evidenced by the untimeliness of

Hasz's motion. Hasz and UNLV knew that the 2024 season was Hasz's fourth and final season of competition under the Five-Year Rule, but UNLV did not pursue relief from the NCAA until April 2025, EFC 7-1 ¶ 10, and, even though that request was denied by May 8, *id*. ¶ 11, Hasz did not file this motion until June 23. "Such delay mitigates a finding of irreparable harm." *Walker*, No. 3:25-cv-00514, ECF. 20. Hasz's motion can be denied solely on the ground that his delay in bringing it was "excessively long and unjustified." *Id*.

Hasz's allegations of irreparable harm also fail on the merits.

First, Hasz's primary alleged injury is a financial loss—*i.e.*, the loss of NIL earnings. ECF 7 ¶ 13. But Hasz's NIL earnings are only speculative because he offers no evidence of any concrete NIL offer. Speculative loss or the mere possibility of harm does not constitute irreparable harm. *Chlorine Inst., Inc. v. Soo Line R.R.*, 792 F.3d 903, 915 (8th Cir. 2015). Even if Hasz were construed to have stated a concrete claim for lost NIL earnings, this type of injury can certainly be quantified and compensated by a damages award. Such injuries are not irreparable harm. *Jet Midwest Int'l Co v. Jet Midwest Grp., LLC*, 953 F.3d 1041, 1046 (8th Cir. 2020). Hasz's assertion that playing DI rather than professional football might improve his future professional (presumably, NFL) prospects is totally speculative.

Second, even if Hasz could be said to "lose an opportunity" to continue his college football career if this preliminary injunction were denied, Hasz fails to distinguish between losing the opportunity to play a specific college season and losing the opportunity ever to play collegiately again. Sitting out for a year due to ineligibility is not irreparable harm. See *Hall v. NCAA*, 985 F. Supp. 782, 800-01 (N.D. Ill. 1997).

Third, Hasz's irreparable-harm cases are distinguishable. Three do not involve antitrust claims and found irreparable harm where plaintiffs suffered unequal treatment in violation of

Title IX.  *See S.A. v. Sioux Falls School Dist. 49-5*, 2023 WL 6794207, at 3 (D.S.D. Oct. 13, 2023); *Navarro v. Fla. Inst. Of Tech., Inc.*, 2023 WL 2078264, at *16 (M.D. Fla. Feb. 17, 2023); *Biediger v. Quinnipiac Univ.,* 616 F. Supp. 2d 277, 291 (D. Conn. 2009).  Hasz cannot show unequal treatment, nor does he assert civil rights claims.  In *Williams v. NCAA*, the Court found irreparable injury where, absent injunction, a student would not be able to play the remaining four games of the season, including one that was "less than twenty-four hours away."  No. 24-cv-614, 2024 WL 397760, at *9 (D.N.J. Feb. 2, 2024).  Here, Hasz's final season is already complete.

On the other side of the scale, granting the relief that Hasz requests would adversely impact the decisions and collegiate careers of tens of thousands of student-athletes.

Other courts have routinely rejected the notion that a student suffers irreparable harm by not being permitted to participate in athletics.  *McGee v. Va. High Sch. League*, 801 F. Supp. 2d 526, 531 (W.D. Va. 2011); *see also S.B. Brown v. Ballard Cty. Bd. of Educ.*, 780 F. Supp. 2d 560, 569 (W.D. Ky. 2011); *Sharon City Sch. Dist. v. PIAA*, No. 9-213, 2009 WL 427373, at *2 (W.D. Pa. Feb. 20, 2009); *Dziewa v. Pa. Interscholastic Ath. Ass'n*, No. 08-5792, 2009 WL 113419, at *7 (E.D. Pa. Jan. 16, 2009); *Doe v. Portland Pub. Sch.*, 701 F. Supp. 3d 18, 39 (D. Me. 2023); *Revesz v. Pa. Interscholastic Ath. Ass'n, Inc.*, 798 A.2d 830, 837 (Commw. Ct. of Pa. May 21, 2002).

### C.    The Balance of Equities and Public Interest Tip Strongly Against Hasz

On a sparse record with no economic analysis, Hasz urges the Court to set a precedent that would effectively suspend longstanding eligibility rules that apply to over 500,000 NCAA student-athletes in multiple sports based on his own personal circumstances.

On one side of the scale, Hasz risks missing an extra season not contemplated by the NCAA rules.  On the other side of the scale, granting the relief that Hasz requests would adversely impact the decisions and collegiate careers of tens of thousands of student-athletes.

*See Coley*, 2025 WL1616719, at *10.  The balance of equities therefore weighs against granting Hasz's Motion, especially on the expedited basis he has demanded and the extremely slim evidentiary record he presented.  *See*, *e.g.*, *Bewley v. NCAA*, No. 23 CV 15570, 2024 WL 113971, at *3 (N.D. Ill. Jan. 10, 2024).

Even if the Court were to balance only the effect of granting individual relief to Hasz and to ignore the precedential effect on others, Hasz would gain at the expense of another Nevada Las Vegas player who would otherwise fill his scholarship and roster spot.  *See Zeigler v. NCAA*, No. 3:25-cv-226-KAC-JEM, 2025 WL 1671952, at *5 (E.D. Tenn. June 26, 2025) ("[G]iven the fixed number of roster spots available… an injunction would run the risk of harming (1) currently-enrolled…players who have already committed to a member institution and (2) current high school seniors who might have their college recruitment disrupted.").  But Hasz needs to show the facts and law are clearly in his favor.  *Bricklayers*, 346 F.Supp at 56.

The public interest likewise goes beyond Hasz's personal interests and extends to the up-and-coming players whom Hasz and those like him will displace if they are given a sixth year of eligibility.  This fall, a young athlete will be the last player to make the cut for Nevada Las Vegas's football team. Hasz's victory in this case will be that athlete's defeat.

## CONCLUSION

The NCAA's goal is to ensure that college athletes are also college students. The Five-Year Rule promotes this goal. Hasz offers no evidence that the Five-Year Rule is anticompetitive under federal antitrust law.  Hasz should be commended for his successful collegiate career, but that career has come to an end.  He fails to meet the high bar to obtain a disfavored mandatory injunction that would upend the status quo, which has well-served the interests of student-

athletes and NCAA member institutions for many years.  Hasz's motion should therefore be denied.

Respectfully submitted,

Dated:  July 10, 2025.


By: s/*F. Matthew Ralph*
F. Matthew Ralph *admitted pro hac vice*
Ben D. Kappelman *admitted pro hac vice*
Dorsey & Whitney LLP
50 South Sixth Street, Suite 1500
Minneapolis, MN 55402
Telephone:  (612) 340-2600
Facsimile:  (612) 340-2868

Email:  ralph.matthew@dorsey.com
Email:  kappelman.ben@dorsey.com


s/*Patrick E. Brookhouser, Jr.*
James G. Powers (NE #17780)
Patrick E. Brookhouser, Jr. (NE #19245)
McGrath North Mullin & Kratz, PC LLO
First National Tower, Suite 3700
Omaha, NE 68102
Telephone:  (402) 341-3070
Facsimile:  (402) 341-0216
Email:  jpowers@mcgrathnorth.com
Email: pbrookhouser@mcgrathnorth.com

## CERTIFICATE OF COMPLIANCE

Pursuant to NECivR 7.1(d), the undersigned certifies that this brief contains 11,374 words, according to the word-count function of Microsoft Word – Microsoft Office 365. The undersigned further certifies that the word-count function was applied to all text, including the caption, headings, footnotes, and quotations. The undersigned also certifies and states that no generative artificial intelligence program was used in drafting this document, or that to the extent such a program was used, the undersigned certifies a human signatory of the document verified the accuracy of all generated text, including all citations and legal authority.

*s/Patrick E. Brookhouser, Jr.*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on the 10th day of July 2025, the foregoing was filed electronically with the Clerk of the Court using the CM/ECF system, which sent notification of such filing to all counsel of record.

*/s/Patrick E. Brookhouser, Jr.*
Patrick E. Brookhouser, Jr.