IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| JACKSON HASZ, | ) | CASE NO. 8:25-cv-398 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **REPLY BRIEF IN SUPPORT OF** |
| | ) | **MOTION FOR PRELIMINARY** |
| NATIONAL COLLEGIATE | ) | **INJUNCTION** |
| ATHLETIC ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |

## Table of Contents

INTRODUCTION ........................................................................................................ 2

ARGUMENT .............................................................................................................. 3

    A. The Rule of Reason articulated in *Alston* is the appropriate standard for evaluating Hasz's Sherman Act claim. ......................................................... 3

    B. Hasz is likely to succeed on the merits because Bylaw 12.8 has a Substantial Anticompetitive Effect on the Labor Market for Division I College Football Players ........................................................................................................ 5

        *1. The US Labor Market for Football Players Seeking to Compete at the NCAA Division I Level is the Relevant Antitrust Market.* .............................................. 5

        *2. The JUCO Eligibility Limitation Bylaws Harm Football Players in the Relevant Labor Market.* ......................................................................................... 8

        *3. The NCAA can't stuff the* Alston-*genie back in the bottle.* ........................... 10

    C. There Are No Pro-Competitive Justifications for Bylaw 12.8 ........................ 11

    D. Any Potential Procompetitive Justifications for Bylaw 12.8 Could Be Accomplished by Less Restrictive Means. ................................................... 13

    E. Hasz is Suffering and Will Continue to Suffer Immediate and Irreparable Harm Without Injunctive Relief. .............................................................. 14

    F. The Balance of Equities favor Hasz ........................................................... 17

CONCLUSION ....................................................................................................... 19

COMES NOW Plaintiff Jackson Hasz ("Hasx") by and through his counsel of record, Robert W. Futhey, of Guinan O'Siochain Law Group, LLC, submits this Reply Brief in Support of his Motion for Temporary Injunction.

## **INTRODUCTION**

In this lawsuit and for his motion for preliminary injunction, Hasz seeks to have the Court declare that the NCAA's By-laws—specifically By-Law 12.8—have an anti-competitive effect as applied to student-athletes who participate in athletic programs at junior colleges ("JUCOs"). The NCAA ignores this, and instead mischaracterizes Hasz as attempting to completely dismantle the NCAA's structure, claiming that Hasz prevailing would "jeopardize *all* eligibility rules," (Filing No. 19, at 1). *See also id.*, at 21 ("If the Five-Year Rule were eliminated, as Hasz advocates….").

The NCAA's "slippery slope" arguments notwithstanding, Hasz and the other college athletes who have filed—and prevailed on—similar lawsuits are seeking relief that is more scalpel and chainsaw. Hasz merely asks that his time participating on a JUCO football team before he started playing Division I football at Buffalo should not "start-the-clock" on his eligibility window. By counting his time on a JUCO football team, the NCAA has violated the Sherman Act.

If Hasz's 5-year eligibility window were to start when it should, i.e., during the Fall 2021 season at the University of Buffalo, he should still have at least one more year of eligibility. This is true for two reasons. First, Hasz was entitled to take advantage of the blanket COVID-waiver that extended player eligibility and seasons-

of-competition by one year. Second, even without the benefit of the COVID-waiver, Hasz's first year at Buffalo in Fall 2021—where he played in only 4 games—should qualify as a *redshirt* season under NCAA Bylaw 12.8.3.1.6 ("In football, a student-athlete representing a Division I institution may compete in up to four contests in a season without using a season of competition.").[1]

As justice Kavanaugh recognized in his concurrence in *Alston*, "[t]he NCAA is not above the law." *NCAA v. Alston*, 594 U.S. 69, 112 (2021) (Kavanaugh, J., concurring). For the reasons discussed below, the Court should find that Hasz has satisfied the *Dataphase* factors and should enter a preliminary injunction against the NCAA.

## ARGUMENT

**A. The Rule of Reason articulated in *Alston* is the appropriate standard for evaluating Hasz's Sherman Act claim.**

Section 1 of the Sherman Act provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal." 15 U.S.C. § 1.

Courts analyze claims under Section 1 of the Sherman Act under "a three-step, burden-shifting framework." *Alston,* 594 U.S. at 96. First, the plaintiff must "prove that the challenged restraint has a substantial anticompetitive effect" in the relevant market. *Id*. If a plaintiff meets this burden, "the burden shifts to the defendant to show a procompetitive rationale for the restraint." *Id*. If a defendant provides this

---

[1] Absent from the NCAA's opposition brief is any attempt to grapple with why Hasz's first season at Buffalo is not a redshirt season.

rationale, "the burden shifts back to the plaintiff to demonstrate that the procompetitive efficiencies could be reasonably achieved through less anticompetitive means." *Id*. "[T]he amount of work needed to conduct a fair assessment of these questions can vary." *Id*. "At one end of the spectrum, some restraints may be so obviously incapable of harming competition that they require little scrutiny. . . . At the other end, some agreements among competitors so obviously threaten to reduce output and raise prices that they might be condemned as unlawful per se or rejected after only a quick look." *Id*. at 89.

This framework is also known as the "rule of reasonableness." In other recent cases, the NCAA has attempted to convince courts that its rules should only be subject to "quick look analysis." Having consistently lost on this issue[2], the NCAA only makes a passing attempt to suggest the "quick look" framework is appropriate. As the Supreme Court recognized in *Alston*, the rule of reasonableness is the applicable standard. *See Alston*, 594 U.S. at 90-91 ("While a quick look will often be enough to approve the restraints '*necessary to produce a game*,' … a fuller review may be appropriate for others.") (cleaned up and emphasis added); *id*. at 94-95 ("To the extent [the NCAA] means to propose a sort of judicially ordained immunity from the terms of the Sherman Act for its restraints of trade—that we should overlook its restrictions because they happen to fall at the intersection of higher education, sports, and money—we cannot agree."). "[T]he NCAA is not otherwise entitled to an exemption from the antitrust laws." *Id*. at 109 (Kavanaugh, J., concurring).

---

[2] *See, e.g., Elad v. NCAA*, 2025 U.S. Dist. LEXIS 78922, at *21 (D.N.J. Apr. 25, 2025) (utilizing a rule of reason framework for similar claims to Hasz).

4

**B. Hasz is likely to succeed on the merits because Bylaw 12.8 has a Substantial Anticompetitive Effect on the Labor Market for Division I College Football Players**

Hasz has identified two relevant markets affected by Bylaw 12.8: the labor market for Division I athletes, and the consumer market for college football. Bylaw 12.8 limits the supply of eligible players, thereby reducing competition among athletes for roster spots and NIL opportunities. This harm to competition is not speculative; it is a direct consequence of the rule's restrictive nature. *Cf. PLS.com, LLC v. Nat'l Ass'n of Realtors*, 32 F.4th 824, 836 (9th Cir. 2022) (recognizing an injury to the market for real estate seller listing, where the defendant's policy "essentially eliminates competition for most sellers' agents' listings between NAR-affiliated MLS and rival services.").

Bylaw 12.8 is an obviously inappropriate horizontal price fixing restraint on trade because it decreases NIL Compensation available to certain athletes, by: (1) maintaining stringent, inequitable, and unfair transfer eligibility requirements for JUCO athletes compared to their counterparts at four-year institutions; and (2) by limiting their years of eligibility because they attended a JUCO before transferring to an NCAA Division I school.

*1. The US Labor Market for Football Players Seeking to Compete at the NCAA Division I Level is the Relevant Antitrust Market.*

Bylaw 12.8 affects the labor market for football players, like Hasz, at the NCAA Division I level. *Ohio*, 706 F.Supp.3d at 592. The NCAA maintains exclusive market

5

power, with the sole ability to dictate regulations for participation. *Id.* ("Thus, these labor markets within NCAA DI college athletics in the United States are relevant antitrust markets."). The NCAA's 1,100 member institutions are located nationwide and engage in on-field competition in the relevant labor markets throughout the United States. Within this market, NCAA Division I colleges compete against each other to recruit the best college athletes for their athletic teams. The NCAA and its member institutions control the market for elite collegiate athletics. Any athlete seeking to exchange athletic services for educational benefits and the unique advantages of top-tier college sports must, as a practical matter, attend an NCAA Division I institution.

There are no alternatives to the NIL Compensation opportunities or other benefits college football players receive from participating in NCAA Division I football. *See* Exhibit 1, Second Hasz Declaration ¶¶ 11-12; *id.* at Exhibit A to the Second Hasz Declaration, "NIL at 3", The Annual Opendorse Report for 2024-2025, page 4 (estimating that more than 99% of all college football NIL money goes to Division I players). The opportunity to showcase athletic skills at the highest level of amateur athletic competition while pursuing a college degree from a Division I institution makes participation in this market unique. The NCAA and its members maintain exclusive market power, with the sole ability to dictate the rules and regulations for Division I athletics. These rules are enacted and amended by votes of the member institutions and thus, constitute horizontal agreements among

6

competing schools. *Alston*, 594 U.S. at 79; *Pavia v. NCAA*, 760 F. Supp. 3d 527, 540 (M.D. Tenn. 2024).

The transactions in which the NCAA and its members engage in this market with college athletes are commercial in nature and fall within the purview of the Sherman Act. Bylaw 12.8 is commercial in nature because an NIL agreement is a commercial transaction and Bylaw 12.8 limits who is eligible to play and therefore to negotiate a NIL agreement. *Pavia*, 760 F. Supp. 3d at 537 ("And it necessarily follows that restriction on who is eligible to play and therefor to negotiate NIL agreements is also commercial in nature."). Selectively limiting JUCO students from that pool necessarily has a commercial effect. *Id*. As a practical matter, while legally available to JUCO athletes, NIL opportunities are only available to college athletes competing at NCAA Division I schools, as almost all NIL dollars are paid to NCAA athletes. Hasz had no real opportunity to earn NIL Compensation, and earned none, when he was in JUCO. *See* Exhibit 1, Second Hasz Declaration ¶¶ 11-12; *id*. at Exhibit A to the Second Hasz Declaration, "NIL at 3", The Annual Opendorse Report for 2024-2025, page 4 (estimating that more than 99% of all college football NIL money goes to Division I players).

As predicted, the NCAA argues, as it has previously and unsuccessfully done in other cases, that Hasz has not suffered an anticompetitive injury because his injuries are supposedly only personal to him. *See* Filing No. 19, at 23. However, courts have rejected this argument and "recognized, this 'ignores the new economic realities in the age of NIL compensation.'" *Elad*, 2025 U.S. Dist. LEXIS 78922, at *23-

7

*24 (granting TRO and holding that Elad has shown a likelihood that the JUCO Rule has a substantial effect on the labor market for college football) (quoting *Pavia*, 760 F. Supp. 3d at 540). "[R]estrictions on who can compete (earn NIL compensation) and for how long necessarily have anticompetitive effects." *Pavia*, 760 F. Supp. 3d at 541. Hasz has demonstrated Bylaw 12.8 has a substantial anticompetitive effect on a relevant commercial market.

> 2. *The JUCO Eligibility Limitation Bylaws Harm Football Players in the Relevant Labor Market.*

The NCAA member institutions must coordinate on some level for Division I college football to exist. Indeed, "some degree of coordination between competitors within sports leagues can be procompetitive," for without agreed-upon rules of a given sport, "the very competitions that consumers value would not be possible." *Alston*, 594 U.S. at 90.

However, "[t]hat some restraints are necessary to create or maintain a league sport does not mean all 'aspects of elaborate interleague cooperation are.'" *Id.* (quoting *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 199 n.7 (2010)). In fact, "[a]s the *Alston* Court explained, the NCAA has previously admitted that it participates in 'horizontal price fixing in a market where the defendants exercise monopoly control.'" *Ohio*, 706 F.Supp.3d at 591 (quoting *Alston*, 594 U.S. at 86). Like the compensation-related restrictions at issue in *Alston*, Bylaw 12.8 "fall[s] on the far side of this line." *Id.* In granting a TRO against the NCAA concerning transfer restrictions, the court in *Ohio* noted, "[h]ere, these [NCAA] bylaws are essentially horizontal agreements

8

among competitors that compete in the same sport-specific markets within NCAA DI theatrics." *Ohio*, 706 F.Supp.3d at 591.

Bylaw 12.8 amounts to no more than an agreement to limit the amount of time athletes may play Division I football because they have chosen to attend a non-NCAA institution before transferring to a Division I NCAA college. These same restrictions are not placed on athletes who choose to delay entry to a Division I NCAA college to:

- Attend prep schools (which are exempted from the definition of a collegiate institution; *see* Filing No. 20.2, Bylaws 12.8.1.1 and 14.02.4);

- Attend an "official religious mission" (*id.*, Bylaw 12.8.1.2);

- Serve in the military or the Peace Corps (*id.*, Bylaw 12.8.1.2);

- Participate in a study abroad program (*id.*, Bylaw 12.8.1.3);

- Participate in an internship (*id.*, Bylaw 12.8.1.4);

- Due to Pregnancy (*id.*, Bylaw 12.8.1.5);

- Participate in global competitions, such as the Olympics (*id.* Bylaw 12.8.1.6);

- Attend a service academy (*id.*, Bylaw 12.9); or

- Participate in a different sport, professionally.[3]

Bylaw 12.8 harms JUCO and former JUCO athletes in four main areas of the relevant markets: (1) when an athlete is deciding whether to attend a JUCO after high school graduation; (2) when an athlete is deciding whether to play a sport while attending a

---

[3] Famously, former Florida State University quarterback Chris Weinke played minor league professional baseball for several years before playing college football, enrolling at FSU at the age of 25. Weinke was 27-years old when he won the Heisman trophy following the 2000 football season. https://en.wikipedia.org/wiki/Chris_Weinke (last visited July 13, 2025).

JUCO; (3) when an athlete is deciding whether to attend a JUCO for a second year or transfer to an NCAA Division I College; and (4) when an athlete has transferred from a JUCO to a NCAA Division I College and remaining eligibility is limited to two or at most three years. Once again, Hasz has demonstrated Bylaw 12.8 has a substantial anticompetitive effect on a relevant commercial market.

### 3. The NCAA can't stuff the Alston-genie back in the bottle.

The NCAA complains that Hasz is attempting to "piggyback" on the market-definition used in *Alston*, because the NCAA "admitted" that market existed. *See* Filing No. 19 at 16-17. Arguing that "issue preclusion" doesn't apply, the NCAA claims it can't be held to its previous admitted market definition in *Alston*.

But the NCAA is arguing about the wrong estoppel doctrine. The one at issue in this case is *judicial estoppel*. This doctrine protects the integrity of the judicial process. *Monterey Dev. Corp. v. Lawyer's Title Ins. Corp.*, 4 F.3d 605, 609 (8th Cir. 1993) (quoting *Morris v. State of California*, 966 F.2d 448, 453 (9th Cir. 1991)). Judicial estoppel "does not require proof of privity, reliance, or prejudice by the party invoking it." *Id.* (citing *Konstantinidis v. Chen*, 626 F.2d 933, 937 (D.C. Cir. 1980). "[T]he doctrine may be invoked to prevent a party from playing '*fast and loose with the courts.*'" *Id.* (quoting *Konstantinidis*, 626 F.2d at 937) (emphasis added).

In *Alston*, the NCAA admitted the following markets existed, which were defined by the District Court in that case:

> The market for athletic services in men's and women's Division I basketball and FBS football, wherein each class member participates in his or her sport-specific market. The most talented athletes are concentrated in the markets

> for Division I basketball and FBS football. There are no "viable substitutes," as the "NCAA's Division I essentially *is* the relevant market for elite college football and basketball. In short, the NCAA and its member schools have the power to restrain student-athlete compensation in any way and at any time they wish, without any meaningful risk of diminishing their market dominance.

*Alston*, 594 U.S. at 81-82 (cleaned up); *see also id.* at 86 ("Put simply, this suit involves admitted horizontal price fixing in a market where the defendants exercise monopoly control.").

The NCAA has already admitted the existence of this commercial market, which is in play in this lawsuit. Courts have routinely found the NCAA Bylaws can in some circumstances harm that commercial market, through limiting compensation and eligibility for JUCO college athletes. *See generally Alston*, *Pavia*, *Elad*. The NCAA's admission of this market needs not be re-litigated in this case. The Court should not allow the NCAA to play "fast-and-loose" with the courts, by withdrawing admissions it has made in prior cases to meet the exigencies of its current arguments.

**C. There Are No Pro-Competitive Justifications for Bylaw 12.8**

Because Hasz has shown Bylaw 12.8 has a substantial anticompetitive effect on the relevant commercial market, the burden shifts to the NCAA to prove a pro-competitive justification for Bylaw 12.8. The NCAA lacks any pro-competitive justification due to the development of NIL as an exclusive opportunity available only to NCAA Division I football players. *Alston*, 594 U.S. at 109 (Kavanaugh, J., concurring) ("the NCAA may lack such a [procompetitive] justification"); *Elad*, 2025 U.S. Dist. LEXIS 78922, at *24 (not finding NCAA's "justifications compelling"). The

11

NCAA once again asserts potential justifications for Bylaw 12.8 (which multiple courts have rejected).

First, the NCAA posits Bylaw 12.8 "creat[es] and preserv[es] college athletics as a unique offering from professional sports." Filing No. 19, at 24. The court in *Elad* rejected a similar argument, finding this justification not compelling. *Id.* If the differentiated product for the NCAA is a younger, less experienced athlete, this does not square with the NCAA's other exceptions to the Five-Year Rule that permits older students joining after playing pro sports, attending prep schools, serving in the military, or engaging in other activities. *See supra*, at 8.

Second, the NCAA claims Bylaw 12.8 "ensur[es] more prospective student-athletes can enjoy [the experience of playing college football]." Filing No. 19 at 25. But the *Pavia* court observed a practical inconsistency with this claim: "Division I programs use the transfer portal to fill roster spots for the next season. Those transfers–which are allowed by the NCAA–take a spot that might otherwise go to an incoming freshman player." *Pavia*, 760 F. Supp. 3d at 542 (internal citations omitted). The *Pavia* Court concluded that the NCAA has not carried its burden of advancing a procompetitive rationale for its restraints.

Third, the NCAA asserts Bylaw 12.8 "foster[s] better alignment between athletics and academics." However, "[t]hese arguments [including academic well-being and the amateurism model] are justifications in name only because they are pretextual and, even if valid, which they are not, could be accomplished through less

restrictive alternatives." *Ohio,* 706 F.Supp.3d at 595. The NCAA has not met its burden to show a procompetitive justification for Rule 12.8.

**D. Any Potential Procompetitive Justifications for Bylaw 12.8 Could Be Accomplished by Less Restrictive Means.**

The Court is not required to engage in this step of the analysis because the NCAA has not met its burden of showing a procompetitive justification for Bylaw 12.8. But for the sake of argument, if this step is reached, the Court should find there are less restrictive alternatives that could accomplish those stated justifications.

As the exclusive governing authority over intercollegiate athletics, the NCAA leverages its dominant market position to impose eligibility and academic requirements that disproportionately restrict and burden JUCO athletes. Even if the academic and amateurism goals of the NCAA were valid pro-competitive justifications (they are not), these goals could be accomplished through less restrictive alternatives, such as applying the same transfer requirements for JUCO transfers and those transferring from one NCAA school to another NCAA four-year member institution.

As suggested in *Pavia*, minor revisions to the JUCO Eligibility Limitation Bylaws could maintain any pro-competitive intent by the NCAA without damaging JUCO athletes. *Pavia*, 760 F. Supp. 3d at 543. The start of the Eligibility Clock could be triggered upon registration for classes at "an NCAA member institution" instead of at a "collegiate institution" as in the current bylaws. Likewise, the definition of "Intercollegiate Competition" (Filing No. 20-2, Bylaw 12.02.6) could be changed to

13

reference when an athlete is "in an NCAA member institution" as opposed to "in either a two-year or a four-year collegiate institution" as the current bylaws state. Finally, the "four seasons" of competition listed in the Five-Year Rule could be changed to "five seasons," allowing all athletes to compete in as many seasons as they can within five years. Thus, supposed pro-competitive justifications for Bylaw 12.8 can be accomplished through less restrictive alternatives.

A rule of reason analysis of Bylaw 12.8 reveals that it is the exact kinds of unreasonable restraints of trade within labor markets that the antitrust laws prohibit. Thus, Hasz has a strong likelihood of success on the merits of his Sherman Act Section 1 claim.

**E. Hasz is Suffering and Will Continue to Suffer Immediate and Irreparable Harm Without Injunctive Relief.**

Currently, Hasz has no opportunity to continue playing NCAA Division I football and earning money from his NIL is tied to his ability to play next season. *See* Exhibit 1, Second Hasz Declaration, ¶¶ 3-10.. Accordingly, this is an immediate and irreparable injury. *S.A. v. Sioux Falls School Dist. 49-5*, 2023 U.S. Dist. LEXIS, at *9 (D.S.D. Oct. 13, 2023) ("College students suffer irreparable harm when they are denied the opportunity to play sports."); *Navarro v. Fla. Inst. Of Tech., Inc.*, 2023 U.S. Dist. LEXIS, at *16 (M.D. Fla. Feb. 17, 2023) (courts have consistently held that losing the opportunity to participate in sports is irreparable harm); *Biediger v. Quinnipiac Univ.*, 616 F. Supp. 2d 277, 291 (D. Conn. 2009) ("[G]iven the fleeting nature of college athletics, plaintiffs will suffer irreparable harm by losing the

14

opportunity to participate in their sport of choice on a continuous and uninterrupted basis.").

Hasz will suffer substantial irreparable harm if this Court does not grant the relief requested. A preliminary injunction would enable Hasz to immediately join a Division I program and to be able to compete in the upcoming 2025 football season. *Williams*, 2024 U.S. Dist. LEXIS 18479, at *7-*8 (missing out on these opportunities is the very definition of irreparable harm).

Hasz's missed opportunities continue to mount. *Ohio,* 706 F.Supp.3d at 599 (Missing offseason work "constitutes a significant impact on the student-athletes' opportunities to develop as players, develop experience with their teammates, showcase their abilities to potential employers, and help their teams advance to their respective Conference Tournament and NCAA Tournament.") Every game is crucial for a student athlete and their team. *Id.* (The absence of a student-athlete from his team may have life-altering impacts on the student-athlete's ability to pursue NIL deals and a professional career in their sport, as well as impacts on their mental health.") Unless assured to be eligible to play this season, Hasz will also lose the opportunity to properly prepare for training camp in actual preparation for the 2025 season.

If the Court does not grant Hasz's requested relief, he will be unable to play next season and be denied the opportunity to gain the attention that can only be obtained by playing at the highest level of college football competition. Exhibit 1, Second Hasz Declaration, ¶ 6; *see also Williams*, 2024 U.S. Dist. LEXIS 18479, at *7-

*8 ("Were the NCAA not enjoined, Williams would be forced to forego four more games, depriving him of the opportunity to develop his skills and his in-game rapport with his teammates, further his team's post-season hopes, to market his name and likeness, and to showcase his abilities to future employers."). Additionally, opportunities for Hasz to obtain NIL-compensation likewise are left to "rot-on-the-vine" because of the NCAA currently deems him ineligible to play Division I football. Every day Hasz lives under the punitive restrictions of Bylaw 12.8, he suffers irreparable harm. Without the requested injunctive relief, Hasz is unable to play and enter into a potential life-altering source of revenue.

Citing a recent Louisiana case, the NCAA also claims Hasz delayed his filing, so he can't show irreparable harm. Filing No. 19, at 29 (citing *Walker v. NCAA*, No. 3:25-cv-00514, ECF 20 (M.D. Fla. July 1, 2025). The *Walker* comparison falls short, however, for at least a few reasons. First, the Court's decision in *Walker* flies in the face of the many authorities—some of which are cited above—recognizing college athletes are irreparably harmed when they are denied an opportunity to play a sport.

Second, no other court that has grappled with the eligibility issues in play here has made a similar finding of undue delay by the student-athlete. That goes for cases where both the student-athlete prevailed and where the NCAA prevailed. *See*, *e.g.*, *Elad*, 2025 U.S. Dist. LEXIS 78922, at *25 ("The NCAA argues that Elad's delay in seeking relief from the court militates against his showing of irreparable harm. The Court, however, finds no undue delay."); *compare also* NCAA's Opposition to Motion for Preliminary Injunction in *Coley v. NCAA*, Case No. 5:25-cv-00098, ECF 17, at 6-7

16

(E.D.N.C. March 27, 2025) (advancing a similar undue delay argument), *with generally Coley v. NCAA*, 2025 U.S. Dist. LEXIS 108342 (E.D.N.C. June 6, 2025) (not addressing the NCAA's similar undue delay argument). *Walker* is on an island by itself.

Third, *Walker* is not on point to this case because Hasz had a pending waiver on file with the NCAA until May 8, 2025, which his current school (i.e., UNLV) ultimately decided not to appeal. *See* Hasz Declaration, Filing No. 7-1, ¶¶ 10-11; Vaughn Declaration, Filing No. 20-1, ¶¶ 25-31. So, Hasz was required to take matters into his own hands, by filing this lawsuit on June 16th (Filing No. 1) and his motion for preliminary injunction on June 23rd (Filing No. 5). *Cf. Elad*, 2025 U.S. Dist. LEXIS 78922, at *25 ("Elad sought relief from the NCAA through February 28, 2025 until his request was denied. Afterwards, Elad and Rutgers continued to negotiate with the NCAA, including pursuing an internal appeal. Elad filed his Verified Complaint less than a month later. The Court therefore finds Elad timely sought his relief here."). Hasz has not unduly delayed this filing, and the Court should find he will be irreparably harmed if he is denied the opportunity to play football this fall.

### F. The Balance of Equities favor Hasz

Here, the NCAA faces no substantial harm from the granting of temporary and preliminary injunctive relief. As an initial matter, requiring the NCAA to comply with federal antitrust laws cannot constitute harm. See *Calvert Health, LLC v. Four Leaf Liquidators, LLC*, 2024 U.S. Dist. LEXIS 2697, at *25 (M.D. Tenn. Jan. 5, 2024)

("Defendants face no hardship as a consequence of their compelled compliance with federal law.").

The balance of the equities supports Hasz's Motion and favors issuance of a preliminary injunction stopping the enforcement of Bylaw 12.8 as to JUCO athletes, like Hasz. *See Ohio*, 706 F. Supp.3d at 600 (holding student athletes ineligible for competition under the NCAA Bylaws faces immediate and irreparable harm for every athletic contest they are forced to sit out, whether it be economic harm or well-being harm). "The equities favor allowing these student-athletes to realize the present and future economic potential of their participation in college athletics and allowing student athletes in the transfer process to use the market to respond to changing circumstances and seek the most beneficial situation for their own well-being unencumbered by the ineligibility...." *Id.*

Hasz is likely to suffer substantial, immediate, and irreparable harm should he be prevented from playing this upcoming season. The NCAA, by contrast, would suffer little harm insofar as, should they later succeed on the merits, they can terminate Hasz's eligibility. *Elad*, 2025 U.S. Dist. LEXIS 78922, at *28 ("[T]he Court finds that the balance of the equities weighs heavily in Elad's favor."). Given that the NCAA has already demonstrated an ability to adapt its rules to accommodating special circumstances—e.g., granting an additional year of eligibility under blanket COVID waiver given to all athletes—it should be plainly obvious that adapting its rules to permit former JUCO players, like Hasz, to participate in an additional season is not some earth-shattering outcome.

18

## **CONCLUSION**

Hasz respectfully requests this Court grant his motion for preliminary injunction. Without immediate relief, Hasz will suffer irreparable harm to his athletic career, lose substantial NIL opportunities, and forfeit a critical window to secure his future as a professional athlete. The NCAA's blind enforcement of arbitrary and anticompetitive eligibility rules violates the Sherman Act, breaches duties owed under the NCAA member structure, and inflicts disproportionate harm on JUCO athletes. Hasz has demonstrated a strong likelihood of success on the merits, faces imminent and irreparable injury, and has no adequate remedy at law. The balance of equities and the public interest both strongly support judicial intervention.

Accordingly, Hasz respectfully requests the Court enter a preliminary injunction to prevent the NCAA from enforcing Bylaw 12.8 as to Hasz pending entry by the Court of a final judgment in this action. Hasz further requests that the Court enjoin the NCAA from retaliating against Hasz or any NCAA member institution by punishing them under the Rule of Restitution, NCAA Bylaw 12.11.4.2, for conduct allowed by any preliminary relief that this Court orders.

DATED this 14th day of July, 2025.

JACKSON HASZ, Plaintiff

BY:  /s/ Robert W. Futhey
Robert W. Futhey, #24620
GUINAN O'SIOCHAIN LAW GROUP
1010 N. 102nd St., Ste. 203
Omaha, NE 68114
(402) 783-6777
rfuthey@golegalne.com
ATTORNEY FOR PLAINTIFF

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies, pursuant to NECivR 7.1(d), that this brief contains 5000 words including all text, captions, headings, footnotes, and quotations, according to the word count function of Microsoft Word 365. The undersigned further certifies that no generative artificial intelligence program was used in drafting this document, or to the extent that such a program was used, a human signatory of the document verified the accuracy of all generated text, including all citations and legal authority.

/s/ Robert W. Futhey

4918-9169-7492, v. 1

20